UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ST SHIPPING AND TRANSPORT, INC.,                    :
                                                    :
                    Plaintiff,                      :
                                                    :        07 Civ. 11147 (SAS)
        - against -                                 :
                                                    :        ECF CASE
GOLDEN FLEECE MARITIME INC.,                         :
                                                    :
                    Defendant.                      :
                                                    :
BLANCA SHIPMANAGEMENT COMPANY,                       :
                                                    :
Third-Party Claimant,                               :
                                                    :
-----------------------------------------------------------------X

### REPLY MEMORANDUM OF LAW IN SUPPORT OF THIRD PARTY BLANCA SHIPMANAGEMENT COMPANY'S AND DEFENDANT GOLDEN FLEECE MARITIME INC.'S MOTIONS TO VACATE MARITIME ATTACHMENT

Lennon, Murphy & Lennon, LLC
Attorneys for Defendant Golden Fleece Maritime Ltd.
Attorneys for Third Party Claimant Blanca Shipmanagement Company
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170

## PRELIMINARY STATEMENT

Pursuant to Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (hereafter "Supplemental Rule __") Defendant, Golden Fleece Maritime Ltd. (hereinafter "Golden Fleece or "Defendant"), and Third-Party Claimant, Blanca Shipmanagement Company (hereinafter "Blanca"), by their undersigned counsel, Lennon, Murphy & Lennon, LLC, submit the within Reply Memorandum of Law in Support of their Motions to Vacate the Maritime Attachment obtained by Plaintiff, ST Shipping and Transport, Inc. (hereinafter "Plaintiff").

At the outset, it should be noted that Blanca is not a Defendant in this matter. Blanca is merely an interested party whose funds have been attached. Plaintiff has not alleged any claim against Blanca. Thus, Plaintiff's recitation of its burden under *Aqua Stoli* in terms of showing a prime facie valid maritime claim is not relevant here. Rather, in order to survive Blanca's motion to vacate, Plaintiff needs to affirmatively show that the named Defendant, Golden Fleece, has a clear interest in the funds attached. Plaintiff needs more than mere allegations and conjecture to show that the funds attached constitute property of Golden Fleece.

Neither Golden Fleece nor Blanca have alleged in the present motions that Plaintiff has failed to allege a prima facie valid claim. Nevertheless, in its opposition papers, Plaintiff continually addresses its burden to show a prima facie valid claim. This is a red herring. Plaintiff must not merely "allege" that the property attached belongs to a named Defendant or that it is theoretically possible/plausible the named Defendant has a beneficial interest in the funds attached. Rather, Plaintiff must affirmatively show that the named Defendant has a clear interest in the property in question. *See generally Egyptian Navigation Co. v. Baker Investments Corp.*, 08 Civ. 2080 (SHS), 2008 U.S. Dist. LEXIS 30804 (S.D.N.Y. April 14, 2008)(granting

1

motion to vacate as plaintiff failed to affirmatively prove that the funds attached belonged to the named defendant, notwithstanding the fact that plaintiff continually alleged that the named defendant had a beneficial interest in the funds attached).

Plaintiff has failed to cite one case showing that Plaintiff may restrain the funds of an interested party, who is not named in the complaint, merely because it alleges that the named Defendant has an interest in those funds. This is because in the context of a motion to vacate the attachment brought by a non-party the plaintiff has the affirmation burden to prove that the "defendant's property may be found within the district." *Aqua Stoli,* 460 F.3d at 445. Here, Plaintiff has failed to show that the EFT restrained by Citibank was the property of the named defendant, Golden Fleece. On the contrary, it was the property of non-party Blanca. As a result, the attachment of the EFT restrained by Citibank should be vacated.

Plaintiff conveniently glosses over its burden to prove that the Golden Fleece has a property interest in the funds at issue here, reciting labels like "prima facie" and "probable cause." However, the simple fact remains that Plaintiff has failed to submit any evidence which would rebut Blanca's showing that Golden Fleece does not have a beneficial interest in the funds. Thus, the attachment cannot stand.

## ARGUMENT

### POINT I

### PLAINTIFF HAS FAILED TO MEET ITS BURDEN TO SHOW THAT GOLDEN FLEECE HAS A CLEAR INTEREST IN THE PROPERTY ATTACHED

In order to survive the instant motion, Plaintiff must affirmatively show that Defendant has a clear attachable property interest in the funds attached. It is not enough that a wire may have some relationship to the Defendant. See e.g. *Prime Shipping Co. v. Wajilam Exps. PTE. LTD*, 06 Civ. 1183 (JSR), 2006 U.S. Dist. LEXIS 34637 (S.D.N.Y. 2006)(vacating attachment of

2

funds moving under letter of credit referencing named defendant as plaintiff failed to show that

defendant had a clear, attachable property interest therein). If the plaintiff does not produce

sufficient evidence to show that defendant has a clear interest in the funds attached, the

attachment must be vacated. Mere allegations of ownership and conjecture by the plaintiff are

not enough to show that a defendant has an attachable interest in the funds in question. *See*

*Egyptian Navigation Co.*, 2008 U.S. Dist LEXIS 30804.

Here, Plaintiff has failed to carry its burden of demonstrating that the funds restrained by

Citibank are the Golden Fleece's property, rather than the property of non-party Blanca. As set

forth in the Declaration of Duncan McDonald accompanying the Motion to Vacate, Golden

Fleece did not have a beneficial proprietary interest in the funds attached as the Side Letter to the

Memorandum of Agreement for the sale of the Vessel M/V ELLI executed by Golden Fleece and

Blanca gave rise to a trust, whereby Golden Fleece (sellers) would hold all hire payments under

the time charter with Indian Oil in trust for Blanca (buyers). After the creation of the trust, the

hire, as trust property, became immune to claims by creditors of the Sellers, such as Plaintiff. In

support thereof, Blanca produced several documents including, but not limited to, the

Memorandum of Agreement and Side Letter (which gave rise to the trust) and statements from

Golden Fleece (through its English counsel), Blanca (through its New York counsel)[1] and

Liquimar, the Vessel's manager.

---

[1]    Plaintiff challenges the Declaration previously submitted to this Court by undersigned counsel on the basis that this information must come from Blanca directly. The Declaration was in fact created from information and documents provided by Blanca. While the Declaration submitted is admissible in these proceedings, to ease Plaintiff's concerns, Blanca has affirmed all of the statements set forth in the previous Peterson Declaration. Please find attached hereto as Exhibit "A" the Declaration of Mr. Marios Iliopoulos attesting to the details of the vessel sale previously set forth in the Declaration of Nancy R. Peterson.

Plaintiff has failed to submit any documentation to rebut the evidence submitted by

Blanca showing that a trust was created under English law and Golden Fleece does not have a

beneficial proprietary interest in the funds attached. Plaintiff merely suggests, without providing

any substantiation, that it is theoretically possible that a valid trust was not created. Just because

Plaintiff posits there is a possibility that the funds attached could belong to Golden Fleece does

not make it true. Blanca has explained the factual basis of the transaction underlying the transfer

of the funds currently under attachment and the validity thereof. Plaintiff has failed to rebut

Blanca's explanation with any evidence to the contrary.

Furthermore, as set forth in the Second Declaration of Duncan McDonald dated August

4, 2008, Plaintiff's attempts to attack the legal basis of the trust are baseless and should be

disregarded.

### Golden Fleece has no beneficial interest in the funds attached under
### English law and Plaintiff's arguments to the contrary should be disregarded

Plaintiff's English counsel, Mr. Edward Mills-Webb, challenges the legal basis of the

trust on two grounds. First, Mr. Mills-Webb argues that based on the language in the operative

documents, the parties possibly did not express an intent to create a trust. *See Mills-Webb*

*Declaration, ¶13.* However, Mr. Mills-Webb's opinion is belied by his own further statements

in this regard. In particular, Mr. Mills-Webb concedes in the same paragraph that no special

language is needed to create a trust under English law. *See Mills-Webb Declaration, ¶13.* Thus,

his opinion that the parties could be deemed to have not expressed an intent to form a trust is

mere conjuncture.

Moreover, his conjecture is demonstrably false. As confirmed by Mr. McDonald "the

wording of the Side Letter could hardly be clearer as to the intention of the parties thereto: it

declares (clause 1) that the Buyers will be "*entitled absolutely*" to all hire, which shall be "*the*

4

*absolute property*" of the Buyers and will be "*held by the Sellers on behalf of the Buyers*". The

Sellers are to "*promptly account to the Buyers…in full and without deduction or set-off*". Under

English law, this language clearly creates a trust in favour of the Buyers." *See Second*

*Declaration of Duncan McDonald, ¶17.*  Thus, the facts and documentation submitted by Blanca

support Blanca's position that a trust was indeed created.

However, this Court need not decide between competing opinions under English law as

to this issue, <u>as Mr. Mills-Webb does not even claim a lack of the requisite intent or that under

the facts that a trust was not created</u>.  He merely states that trusts are often created in a different

fashion and that one could make an argument that a trust was not created.  This is a far cry from

showing that Golden Fleece has a clear proprietary interest in the funds attached.

Second, Mr. Mills-Webb claims that a trust cannot be created where a trust beneficiary is

not named and/or the trust property is uncertain, which he believes could be the case here.  Mr.

McDonald directly addresses these arguments in his Second Declaration and clarifies that these

are non-issues.  Here, a fixed trust was created (as opposed to a discretionary trust) and both the

beneficiary and trust property were sufficiently certain so as to create a valid trust under English

law. *See Second McDonald Declaration, ¶26.*  Particularly, here, Mr. McDonald confirms

"[t]here is no difficulty at all in identifying the beneficiary at the time when the hire is payable: it

is the Buyers or (if a nomination has been made by the Buyers) the company nominated by them

to receive the hire." *Id.*  As to the certainty of the trust property in the instant case, he states as

follows:

> In the circumstances, it is abundantly clear that the trust property is the hire
> payable to Golden Fleece by IOC under the time charter of the "ELLI" dated 8[th]
> December 2006, and I would bring to the Court's attention that in paragraph 19 of
> his Declaration Mr Mills-Webb clearly accepts (notwithstanding his suggestion
> that the trust property is not sufficiently identified) that the time charter hire under
> the 8[th] December 2006 charter <u>is</u>, in fact, sufficiently identified as the property. In

5

that paragraph, in the course of suggesting that the Side Letter creates an assignment of hire (rather than the creation of a trust), Mr Mills-Webb has stated that it is an assignment of the future hire payments to be received by Golden Fleece from the charterparty, *"presumably"* being the existing charter with the Indian Oil Corp.

*Second Declaration of Duncan McDonald, ¶31.*

Furthermore, even if (as Mr. Mills-Webb has asserted) the Side Letter constitutes an equitable assignment of the charter party hire, under English law the assignment will not be subject to attachment or garnishment by any creditor of Golden Fleece, and under English law any order freezing the assets of Golden Fleece would be varied to allow payment of the hire to the Buyers (Blanca) or their nominee. *See Second Declaration of Duncan McDonald, ¶48.*

Finally, it is noteworthy that there is applicable federal law addressing this issue. In *Egyptian Navigation Co. v. Baker Investment Corp. et. al.,* 08 Civ. 2080 (SHS), 2008 U.S. Dist LEXIS 30804 (S.D.N.Y. April 14, 2008) Judge Stein found that notwithstanding plaintiff's arguments that the assignment at issue was not valid, that the attachment could not stand. The plaintiff in *Egyptian*, as in this case, could simply not show that the property attached belonged to the Defendant and/or that the assignment was invalid. It merely offered insinuations, speculation and conjecture, but did not offer any compelling evidence. As the plaintiff could not affirmatively show that the defendant had a clear, attachable property interest in the attached funds, Judge Stein vacated the attachment.

By executing the Memorandum and Side Letter, creating a trust for the hire payments under the charter party, Golden Fleece divested itself of any property interest in the funds attached, all of which are property exclusively belonging to non-party, Blanca.

As Plaintiff has failed to carry its burden to show that Golden Fleece had a clear, attachable property interest in the funds held by Citibank, the attachment should be vacated.

6

**POINT II**

**THE CASES CITED BY PLAINTIFF ARE NOT RELEVANT
TO THE INSTANT MOTION AND/OR ARE DISTINGUISHABLE**

As set forth above, Plaintiff has the burden of showing that the funds attached belong to a named defendant. In an attempt to lighten its burden, Plaintiff claims that "decisions in this District have rejected the contention that an attachment can be vacated when the funds being transferred to a defendant's account actually belong to another." *See Plaintiff's Opposition Memo, p. 9*. This is incorrect and flies in the face of one of the express requirements set forth in *Aqua Stoli*, namely that a plaintiff is required show that the defendant has property in the District. The decisions Plaintiff cites stand for the limited proposition that where a named Defendant has a clear beneficial property interest in the funds at issue, those funds may be subject to attachment. It cannot be seriously questioned that where a non-party submits evidence showing that the funds do not belong to the named defendant, that the attachment must be vacated. To hold otherwise would authorize the illegal seizure of funds without due process of law. Claimants would be unable to redress the wrongful attachment of their funds.

Tellingly, Plaintiff **does not contend (or event suggest)** that a plaintiff can attach property held in trust for debts of the trustee. Nonetheless, here, Plaintiff would have this Court ignore the requirement that it show that Golden Fleece has a clear, attachable property interest in the subject funds. Plaintiff's position is illogical and untenable. It is only logical the Plaintiff be required to show that the property attached belongs to Golden Fleece in order to maintain the attachment. Otherwise, any and all property would be subject to attachment on a plaintiff's whim, without the due process of law.

While Plaintiff claimed that Golden Fleece's funds were attached, Blanca rebutted Plaintiff's claims with evidence that the funds attached were in fact held in trust and that Golden

7

Fleece has no beneficial interest in them. Plaintiff has failed to submit any evidence to contradict Blanca's showing. Thus, the attachment must be vacated.

Plaintiff also attempts to bolster its position by citing several cases involving alter-ego allegations made in the context of a Rule B attachment. These cases are totally irrelevant here, as alter-ego has not been alleged (nor could it be in good faith).

Plaintiff would like the Court to find some sort of conspiracy in the sale of the vessel, stating without a shred of credible evidence that Golden Fleece hoped to flee any judgment issued against it. Plaintiff's scurrilous theories are unfounded. As attested to by Mr. McDonald, Golden Fleece has paid the judgments issued in Plaintiff's favor, even after the sale of the Vessel. *See Second Declaration of Duncan McDonald, ¶¶7-8.* Furthermore, the Vessel, a single hulled tanker, was sold due to increasing difficulties in trading such vessels in light of changes in the Marpol regulations, not because of any fear of judgments to be issued in the future. *Id.* In any event, all of Plaintiff's conspiracy theories are irrelevant as it has not alleged in the original or amended verified complaints that Blanca is an alter-ego of Golden Fleece.

## POINT III

## PLAINTIFF NEITHER VALIDLY DISMISSED THE PRIOR CASE AGAINST GOLDEN FLEECE NOR ADEQUATELY DISCLOSED IT TO THE COURT

Plaintiff's arguments as to the dismissal and disclosure of its prior pending case against Golden Fleece are based on false assumptions. In particular, Plaintiff relies on the two following invalid assertions: (1) a party can dismiss a case without regard to any of the administrative requirements of the Court; and (2), it is not required to disclose prior actions between the same parties to the Court. Both assertions are false.

Plaintiff cannot dismiss a case by submitting a dismissal in any manner it chooses. If a plaintiff executed a notice of dismissal and dropped it on the Court house steps, or nailed it to the

8

Clerk's door, the case would surely not be dismissed.  In the same way, posting a notice of dismissal randomly onto the ECF system in contravention of the Court's procedures does not dismiss a case either.  There are a myriad of ways one could make the ECF system upload any piece of paper.  One merely needs to select any menu choice (such as notice) and then submit. Plaintiff forced the ECF system to upload its dismissal, but the bottom line is that the case remained active and pending, as the docket entries make clear.

Further, Plaintiff's misstates the disclosure requirement for prior related actions filed in the Southern District of New York.  As set forth in the standard civil cover sheet form for the Southern District of New York, the following question must be answered when filing a new matter: "Has this or a similar case been previously filed in SDNY at any time? No ☐ Yes ☐".  If the Answer is "YES", a filer must provide the date and case number of the previously filed case. *Please find attached hereto as Exhibit "B" a redacted civil cover sheet for the SDNY filed in an unrelated matter about the same time as Plaintiff's first action against Golden Fleece.*

Because the two cases against Golden Fleece were clearly similar and related, Plaintiff was undoubtedly required to disclose the action filed against Golden Fleece in May 2007 on the civil cover sheet for the action filed against Golden Fleece in December 2007.

In addition, Plaintiff fails to address why it did not mention the pending action filed against Golden Fleece in May 2007 in its Affidavit in Support of the Maritime Attachment submitted in the December 2007 action against Golden Fleece.  Supplemental Rule B requires that a claimant shall list the efforts made by and on and behalf of the plaintiff to find and serve the defendant within the district.  A prior or pending action which requests a rule B attachment would certainly qualify as an effort to serve the defendant.

Where the affidavit is defective, the Court may validly vacate the attachment. *See*

*Centauri Shipping Ltd. v. Western Bulk Carriers, KS*, 528 F. Supp. 2d 197 (S.D.N.Y. 2007). In

*Centauri,* the plaintiff argued that the attachment should be maintained because even had the

omitted information been included, the Court would not have found the defendant present.   The

Court responded that the plaintiff was not entitled to make such an assumption.   And, as the

Affidavit did not include certain facts relating to defendant's contact with the District, it was

defective and the attachment was vacated.

Accordingly, because Rule B attachment is an equitable remedy, and Plaintiff has acted

most inequitably in failing to follow proper procedure, the attachment should be vacated and the

Amended Verified Complaint should be dismissed for this reason alone.

## CONCLUSION

For the foregoing reasons, the Court should vacate the attachment, direct Citibank to

release the restrained funds to Blanca and instruct the Plaintiff to modify the Ex-Parte Order such

that no further property of Blanca will be attached in the future.   In the alternative, this Court

should vacate the attachment on equitable grounds and dismiss the case for lack of jurisdiction

Dated: August 4, 2008
Southport, CT

Third Party Claimant,
BLANCA SHIPMANAGEMENT COMPANY and

Defendant,
GOLDEN FLEECE MARITIME INC.,


By: _____
Patrick F. Lennon
Nancy R. Siegel
LENNON MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 (phone)
(212) 490-6070 (fax)
pfl@lenmur.com
nrs@lenmur.com

11

## AFFIRMATION OF SERVICE

I hereby certify that on August 4, 2008, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____
Nancy R. Siegel

EXHIBIT "A"

JS 44C/SDNY
REV. 12/2005

**CIVIL COVER SHEET** 

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS                                           DEFENDANTS

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER     ATTORNEYS (IF KNOWN)

Lennon, Murphy & Lennon, LLC, 420 Lexington Ave., Suite
300, New York, NY 10170   (212) 490-6050

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

This is an admiralty and maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure and 28 United States Code § 1333.

Has this or a similar case been previously filed in SDNY at any time? No ☒  Yes ☐   Judge Previously Assigned

If yes, was this case  Vol ☐  Invol. ☐  Dismissed. No ☐  Yes ☐   If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*                     NATURE OF SUIT

ACTIONS UNDER STATUTES

|  | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| **CONTRACT** | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 AGRICULTURE | [ ] 422 APPEAL 28 USC 158 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 620 FOOD & DRUG | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [x] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | | [ ] 430 BANKS & BANKING |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | | | [ ] 450 COMMERCE/ICC RATES/ETC |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | [ ] 630 LIQUOR LAWS | **PROPERTY RIGHTS** | [ ] 460 DEPORTATION |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | | [ ] 640 RR & TRUCK | [ ] 820 COPYRIGHTS | [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | **PERSONAL PROPERTY** | [ ] 650 AIRLINE REGS | [ ] 830 PATENT | |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 370 OTHER FRAUD | [ ] 660 OCCUPATIONAL SAFETY/HEALTH | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 371 TRUTH IN LENDING | [ ] 690 OTHER | | [ ] 490 CABLE/SATELLITE TV |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | **LABOR** | **SOCIAL SECURITY** | [ ] 810 SELECTIVE SERVICE |
| [ ] 160 STOCKHOLDERS SUITS | | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 861 HIA (1395FF) | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 190 OTHER CONTRACT | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 862 BLACK LUNG (923) | [ ] 875 CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | | [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 863 DIWC (405(g)) [ ] 863 DIWW (405(g)) | [ ] 891 AGRICULTURE ACTS |
| [ ] 196 FRANCHISE | **ACTIONS UNDER STATUTES** | | [ ] 740 RAILWAY LABOR ACT | [ ] 864 SSID TITLE XVI [ ] 865 RSI (405(g)) | [ ] 892 ECONOMIC STABILIZATION ACT |
| | | | [ ] 790 OTHER LABOR LITIGATION | **FEDERAL TAX SUITS** | [ ] 893 ENVIRONMENTAL MATTERS |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 870 TAXES [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 894 ENERGY ALLOCATION ACT |
| [ ] 210 LAND CONDEMNATION | [ ] 441 VOTING | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | | | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 220 FORECLOSURE | [ ] 442 EMPLOYMENT | | | | [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 443 HOUSING ACCOMMODATIONS | [ ] 530 HABEAS CORPUS | | | |
| [ ] 240 TORTS TO LAND | [ ] 444 WELFARE | [ ] 535 DEATH PENALTY | | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 540 MANDAMUS & OTHER | | | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 290 ALL OTHER REAL PROPERTY | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 550 CIVIL RIGHTS | | | |
| | [ ] 440 OTHER CIVIL RIGHTS | [ ] 555 PRISON CONDITION | | | |

*Check if demanded in complaint:*

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

DEMAND $ _____  OTHER _____   JUDGE _____   DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: ☐ YES  ☒ NO       NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

(SEE REVERSE)

*(PLACE AN `x` IN ONE BOX ONLY)*                                                      **ORIGIN**

☒ 1 Original Proceeding  ☐ 2a. Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from (Specify District)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge Judgment

☐ 2b. Removed from State Court AND at least one party is a pro se litigant

*(PLACE AN `x` IN ONE BOX ONLY)*                          **BASIS OF JURISDICTION**                     **IF DIVERSITY, INDICATE CITIZENSHIP BELOW.**

☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☒ 3 FEDERAL QUESTION (U.S. NOT A PARTY)   ☐ 4 DIVERSITY      *(28 USC 1332, 1441)*

## CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS UNKNOWN

REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   ☐ WHITE PLAINS   ☒ FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

| DATE | SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT |
|---|---|---|
| 7/13/2007 | | [ ] NO |
| RECEIPT # | | [✗] YES (DATE ADMITTED Mo. 11  Yr. 97 ) |
| | | Attorney Bar Code # KL 5072 |

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ST SHIPPING AND TRANSPORT, INC.,          :
                                          :
          Plaintiff,                      :
                                          :          07 Civ. 11147 (SAS)
          - against -                     :
                                          :          ECF CASE
GOLDEN FLEECE MARITIME INC.,              :
                                          :
          Defendant.                      :
                                          :
BLANCA SHIPMANAGEMENT COMPANY,            :
                                          :
Third-Party Claimant,                     :
                                          :
-------------------------------------------------------------X

### DECLARATION OF MARIOS ILIOPOULOS
### IN SUPPORT OF MOTION TO VACATE

          MARIOS ILIOPOULOS affirms and states the following under the penalties of perjury
under the laws of the United States pursuant to 28 USC 1746: ____

          1.     My name is Marios Illiopoulous. I am the commercial manager of Third Party
Claimant, Blanca Shipmanagement Company ("Blanca").

          2.     I submit this Declaration in support of Blanca's motion to vacate the maritime
attachment filed by Plaintiff, ST Shipping and Transport Inc. ("Plaintiff") in the Southern
District of New York. I set out below an explanation of the sale of the motor tanker "ELLI" and
the accompanying assignment of all contracts and proceeds relating to that Vessel to Blanca.

          3.     At all times material to this action, Blanca was, and still is, a foreign corporation,
or other business entity organized and existing under the laws of the Marshall Islands. *See
Certificate of Good Standing annexed hereto as Exhibit "1."*

4.    I have been advised that on December 11, 2007, Plaintiff filed a Verified Complaint against Golden Fleece Maritime Inc. ("Defendant" or "Golden Fleece"), seeking security in the amount of $380,000.00, and that Plaintiff obtained an attachment order against Golden Fleece which it has been serving on banks in New York.

5.    I have further been advised that pursuant to an Ex Parte Order of Attachment and Garnishment dated on or about December 28, 2007 which authorized the attachment of property belonging to Defendant Golden Fleece in an amount up to $380,000.00, Citibank restrained three electronic funds transfers in the amounts of $101,048.48, $271,600.87 and $7,350.65 at Citibank N.A. on or about January 18, 2008, January 30, 2008, and March 17, 2008 respectively.

6.    All three of these wires were being sent by non-party, Indian Oil Corporation, to pay for charter hire in reference to the M/T ELLI and are the sole and exclusive property of Blanca as Blanca had been assigned all rights to the charter hire for the M/T ELLI as of December 15, 2007.

7.    Defendant Golden Fleece did not, (and does not) have a property interest in those wires.

8.    At all material times Golden Fleece never had an attachable property interest in the funds attached as Golden Fleece had previously irrevocably assigned all rights to hire to Blanca.

9.    Pursuant to a charter party dated December 8, 2006, Defendant Golden Fleece chartered the M/T "ELLI" to non-party Indian Oil Corporation for the carriage of cargo.

10.    Under the Golden Fleece-Indian Oil charter party, Indian Oil paid hire to Golden Fleece at regular intervals.

11. Subsequently, pursuant to a Memorandum and Agreement ("MOA") and side letter dated October 26, 2007, Defendant Golden Fleece (Sellers) agreed to sell the motor tanker "ELLI" to Blanca (Buyers) and assigned all future earnings of the ship under existing contracts/charter parties to Blanca. *See MOA and Side Letter annexed hereto as Exhibits "2" and "3" respectively.*

12. The Side Letter expressly provides that "it is hereby agreed that after December 15th 2007 00:01 local time, Buyers shall be entitled absolutely to all payments of hire made to or to be made by charterers and all such payments shall be the absolute property of the Buyers and shall be held by the Sellers on behalf of the Buyers. The Sellers shall promptly account to the Buyers thereof in full and without deduction or set-off." *See Clause 1, Exhibit "3."*

13. I personally conducted and was directly involved in the negotiations on behalf of Blanca (Buyers) with the assistance of Blanca's legal counsel, Mr. Vangelis Bairacatris of G.E. Bairactaris & Partners.

14. In furtherance thereof, I had discussions with Mr. Illias Papacliou and Mr. Dimitri Papadimitriou acting on behalf of the Defendant Golden Fleece (Sellers).

15. Negotiations were conducted over the telephone and in meetings. They started on or about October 10, 2007, with the MOA and side agreement ultimately being executed on October 26, 2007.

16. The MOA states that delivery was to take place on "January 17, 2008 up to end of current charter with Indian Oil Corporation dated December 8, 2006 as currently extended in Sellers' option. . ."

17. Payment of the purchase price was to be made in full on delivery of the Vessel.

18.    However, as set forth above, the Side Letter mandated that after December 15, 2007, the Buyers, Blanca, would be entitled to all payments of hire made by Charterers (Indian Oil Corporation) and the Vessel would, in effect be deemed to be delivered to the Buyers, although physical delivery and the closing would not take place until the end of the charter with Indian Oil.

19.    The agreement was structured this way so as to avoid complications with the charterer, Indian Oil Corporation, who is controlled by the Indian Government.

20.    However, why the transaction was structured in the way it was is irrelevant. The only relevant facts are that Golden Fleece and Blanca entered into an agreement which irrevocably assigned all hire for the ELLI to Blanca and that the wire transfers restrained were for charter hire of the ELLI.

21.    The closing and delivery of the ELLI took place on 17 March 2008.

22.    Blanca is a wholly separate entity from Golden Fleece and the MOA and side agreement were entered into at arms length and in good faith.

23.    Furthermore, I understand that the dispute involved in Plaintiff's lawsuit against Golden Fleece refers to a previous charter of the M/T ELLI under a charter party dated May 30, 2003. Blanca has nothing to do whatsoever with this charter.

24.    Thus, Plaintiff's attachment of the wire transfers in the amounts of $101,048.48, $271,600.87 and $7,350.65 at Citibank N.A., representing charter hire payments for the M/T ELLI, was improper as those funds had been previously assigned to Blanca.

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

Executed in ___Piraeus, Greece___ on 3rd July 2008.

MARIOS ILIOPOULOS

# EXHIBIT 1

# THE REPUBLIC OF THE MARSHALL ISLANDS

## REGISTRAR OF CORPORATIONS

# CERTIFICATE OF GOODSTANDING

I HEREBY CERTIFY, That I have made a diligent examination of the files of the

Articles of Incorporation, as defined by § 2(a) of the Business Corporations Act, filed with this

Registry for articles, orders or records of dissolution of

### BLANCA SHIPMANAGEMENT COMPANY

the Articles of Incorporation of which were filed

### October 25, 2007

and that upon such examination, I find no such articles, orders or records, and that so far as

indicated by the records of this Registry, such corporation remains a subsisting corporation in

good standing.

WITNESS my hand and the official seal of the

Registry on March 4, 2008.



_____
Deputy Registrar

26572

# EXHIBIT 2

# MEMORANDUM OF AGREEMENT

Dated: October 26th ,2007

Norwegian Shipbroker' Association's Memo-
randum of Agreement for sale and purchase of
ships. Adopted by The Baltic and International
Maritime Council (BIMCO) in 1956.
Code-name
**SALEFORM 1993**
Revised 1966, 1983 and 1986/87.

GOLDEN FLEECE MARITIME INC, of Liberia ,owners of M/T "Elli"                          1
hereinafter called the Sellers, have agreed to sell; and -
BLANCA SHIPMANAGEMENT COMPANY  of Marshall Islands or another company TBN            2
hereinafter called the Buyers, have agreed to buy
                                                                                      3
Name: M/T " ELLI"
                                                                                      4
Classification Society/Class: LR
                                                                                      5
Built        1986                        By: SAMSUNG
                                                                                      6
Flag:        Liberian-                   Place of registration: Monrovia
                                                                                      7
Call Sign:        ELTW2                  Grt/Nrt: 54880/29160
                                                                                      8
Register Number: 10613
                                                                                      9
hereinafter called the Vessel, on the following terms and conditions:
                                                                                     10
Definition
                                                                                     11
"Banking days" are days on which banks are open both in the country of the currency  12
stipulated for the Purchase Price in Clause 1 and in the place of closing stipulated in Clause 8.
                                                                                     13
"In writing" or "written" means a letter handed over from the Sellers to the Buyers or vice versa, 14
a registered letter, telex, telefax or other modern form of written communication.
                                                                                     15
"Classification Society" or "Class" means the Society referred to in line 4.

                                                                                     16
1.  Purchase price U.S 25,000,000 (United States Dollars Twenty five million )cash on delivery

                                                                                     17
2.  Deposit
                                                                                     18
As security for the correct fulfilment of this Agreement the Buyers shall pay to Liquimar Tanker 19
Management Inc. on behalf of Sellers, a deposit of 10% (ten per cent)of the Purchase Price as follows: 20
(A) USD 1,000,000 (United States Dollars One Million) within 3 banking days from the date of this
Agreement,(B) USD 1,500,000 (United States Dollars One Million Five Hundred Thousand) latest by 27th 21
December 2007                                                                         22
                                                                                     23
and held by them in a joint account for the Sellers and the Buyers, to be released in accordance 24
with joint written instructions of the Sellers and the Buyers. Interest, if any, to be credited to the
Buyers. Any fee charged for holding the said deposit shall be borne equally by the Sellers and the 25
Buyers.
                                                                                     26
3.  Payment

The balance of the said  Purchase Price shall be paid in full free of bank charges to Sellers A/C with 27
ALPHA BANK  IBAN GR 07014096009500015006013213, BIC CRBAGRAA.                         28
                                                                                     29
on delivery of vessel, but not later than 3 banking days after the Vessel is in every respect
physically ready for delivery in accordance with the terms and conditions of this Agreement and
Notice of Readiness has been given in accordance with clause 5.

| 4. | Inspections | 30 |

a)*  The Buyers have inspected and accepted the Vessel's classification records. The Buyers have
also inspected the Vessel at/in  Haldia on 25ᵗʰ / 25ᵗʰ September 2007 and have accepted the
Vessel following this inspection and the sale is outright and definite, subject only to the terms
and conditions of this Agreement.

31
32
33
34

b)*  ~~The Buyers shall have the right to inspect the Vessel's classification records and declare
whether same are accepted or not within~~

35
36

~~The Seller shall provide for inspection of the Vessel at/in~~

37

~~The Buyers shall undertake the inspection without undue delay to the Vessel. Should the
Buyers cause undue delay they shall compensate the Sellers for the losses thereby incurred.
The Buyers shall inspect the Vessel without opening up and without cost to the Sellers.
During the inspection, the Vessel's deck and engine log books shall be made available for
examination by the Buyers. If the Vessel is accepted after such inspection, the sale shall
become outright and definite, subject only to the terms and conditions of this Agreement,
provided the Sellers receive written notice of acceptance from the Buyers within 72 hours
after completion of such inspection.
Should notice of acceptance of the Vessel's classification records and of the Vessel not be
received by the Sellers as aforesaid, the deposit together with interest earned shall be
released immediately to the Buyers, whereafter this Agreement shall be null and void.~~

38
39
40
41
42
43
44
45
46
47
48

*  ~~4a) and 4b) are alternatives; delete whichever is not applicable. In the absence of deletions,
alternative 4a) to apply.~~

49
50

| 5. | Notice, time and place of delivery | 51 |

a)  The Sellers shall keep the Buyers well informed of the Vessel's itinerary and shall
provide the Buyers with  10,5,3 and 1  days notice of the estimated time of arrival at the intended
place of drydocking/underwater inspection/delivery subject to the provisions of 5c of this
MOA. When the Vessel is at the place of delivery and in every respect physically ready for
delivery in accordance with this Agreement, the Sellers shall give the Buyers a written Notice of
Readiness for delivery.

52
53
54
55
56

b)  The Vessel shall be delivered and taken over safely afloat at a safe and accessible berth or
anchorage at/in worldwide.

57
58

In the Sellers' option.

59

60

Expected time of delivery: January 17ᵗʰ, 2008 up to end of current charter with Indian Oil
Corporation dated December 8ᵗʰ,2006 as currently extended, in Sellers' option, plus
reasonable steaming to reach a convenient delivery port.

61

62

c)  Date of cancelling ~~(see clauses 5 c),5 b) (iii)and 14)~~: 30 days after vessel's redelivery from
charterers.

63
64

65

In the event that sellers cannot meet the cancelling date due to average damage to the
vessel affecting class, buyers have the option to either take delivery of the vessel as is
where is or buyers shall extend the cancelling date until the vessel's class is reinstated.

66
67
68
69

70

d)  ~~If the Sellers anticipate that, notwithstanding the exercise of due diligence by them, the
Vessel will not be ready for delivery by the cancelling date they may notify the Buyers in
writing stating the date when they anticipate that the Vessel will be ready for delivery and
propose a new cancelling date. Upon receipt of such notification the Buyers shall have the
option of either cancelling this Agreement in accordance with Clause 14 within   7 running
days of receipt of the notice or of accepting the new date as the new cancelling date. If the
Buyers have not declared their option within   7 running days of receipt of the Sellers'~~

71

72
73
74
75

notification or if the Buyers accept the new date, the date proposed in the Sellers' notification 76
shall be deemed to be the new cancelling date and shall be substituted for the cancelling date
stipulated in line 61.

If this Agreement is maintained with the new cancelling date all other terms and conditions
hereof including those contained in Clauses 5 a) and 5 c) shall remain unaltered and in full
force and effect. Cancellation or failure to cancel shall be entirely without prejudice to any
claim for damages the Buyers may have under Clause 14 for the Vessel not being ready by
the original cancelling date.

Should the Vessel become an actual, constructive or compromised total loss before delivery    77
the deposit together with interest earned shall be released immediately to the Buyers          78
whereafter this Agreement shall be null and void.                                              79

6.

Drydocking/Divers Inspection                                                                   80

a)**

The Sellers shall place the Vessel in drydock at the port of delivery for inspection by the     81
Classification Society of the Vessel's underwater parts below the deepest load line, the        82
extent of the inspection being in accordance with Classification Society's rules. If the        83
rudder, propeller, bottom or other underwater parts below the deepest load line are found       84
broken, damaged or defective so as to affect the Vessel's class, such defects shall be made     85
good at the Sellers' expense to the satisfaction of the Classification Society without          86
condition/recommendation*.                                                                      87

b)**

(i)     The Vessel is to be delivered without drydocking. However, the Buyers shall            88
have the right at their expense to arrange for an underwater inspection by a diver approved    89
by the Classification society prior to the delivery of the Vessel. The Sellers shall at their  90
cost make the Vessel available for such inspection. The extent of the inspection and the       91
conditions under which it is performed shall be to the satisfaction of the Classification      92
Society. If the conditions at the port of delivery are unsuitable for such inspection, the     93
Sellers shall make the Vessel available at a suitable alternative place near to the delivery   94
port.                                                                                          95

(ii)    If the rudder, propeller, bottom or other underwater parts below the deepest load line 96
are found broken, damaged or defective so as to effect the Vessel's class, then unless         97
repairs can be carried out afloat to the satisfaction of the Classification society, the Sellers 98
shall arrange for the Vessel to be drydocked at their expense for inspection by the            99
Classification society of the Vessel's underwater parts below the deepest load line, the      100
extent of the inspection being in accordance with the Classification Society's rules. If the  101
rudder, propeller, bottom or other underwater parts below the deepest load line are found     102
broken, damaged or defective so as to effect the Vessel's class, such defects shall be made   103
good by the Sellers at their expense to the satisfaction of the classification society        104
without condition/recommendation*. In such event the Sellers are to pay also for the cost of  105
the underwater inspection and the Classification Society's attendance.                         106

(iii)   If the Vessel is to be drydocked pursuant to Clause 6 b) (ii) and no suitable dry-    107
docking facilities are available at the port of delivery, the Sellers shall take the Vessel   108
to a port where suitable drydocking facilities are available ,whether within or outside the   109
delivery range as per Clause 5 b). Once drydocking has taken place the Sellers shall deliver  110
the Vessel at a port within the delivery range as per clause 5 b) which shall, for the        111
purpose of this clause, become the new port of delivery. In such event the cancelling date    112
provided for in clause 5 b) shall be extended by the additional time required for the         113
dry-docking and extra steaming, but limited to a maximum of 14 running days.                   114

c)

If the vessel is drydocked pursuant to Clause 6 a) or 6 b) above                               115

(i)     the Classification Society may require survey of the tailshaft system, the extent of  116
the survey being to the satisfaction of the Classification surveyor. If such survey is not    117
required by the Classification Society, the Buyers shall have the right to require the tailshaft 118
to be drawn and surveyed by Classification Society, the extent of the survey being in         119

accordance with the Classification Society's rules for tailshaft survey and consistent with    120
the current stage of the Vessel survey cycle. The Buyers shall declare whether they    121
require the tailshaft to be drawn and surveyed not later than by the completion of the    122
inspection of the Classification Society. The drawing and refitting of the tailshaft shall be    123
arranged by the Sellers. Should any parts of the tailshaft system be condemned or found    124
defective so as to effect the Vessel's class, those parts shall be renewed or made good at    125
the Sellers' expense to the satisfaction of the Classification Society without    126
condition/recommendation*.    127

(ii)    the expenses relating to the survey of the tailshaft system shall be borne    128
by the Buyers unless the Classification Society requires such survey to be carried out , in    129
which case the Sellers shall pay these expenses. The Sellers shall also pay the expenses    130
if the Buyers require the survey and parts of the system are condemned or found defective    131
or broken so as to effect the vessel's class*.    132

(iii)    the expenses in connection with putting the Vessel in and taking her out    133
of drydock, including the drydock dues and the Classification Society's fees shall be paid by    134
the Sellers if the Classification Society issues any condition/recommendation* as a result    135
of the survey or if it requires survey of the tailshaft system. In all other cases the Buyers    136
shall pay the aforesaid expenses, dues and fees.    137

(iv)    the Buyers' representative shall have the right to be present in the drydock, but    138
without interfering with the work or decisions of the Classification surveyor.    139

(v)    the Buyers shall have the right to have the underwater parts of the Vessel    140
cleaned and painted at their risk and expense without interfering with the Sellers' or the    141
Classifications surveyor's work, if any, and without affecting the Vessel's timely delivery. If,    142
however, the Buyers' work in drydock is still in progress when the Sellers have    143
completed the work which the Sellers are required to do, the additional docking time    144
needed to complete the Buyers' work shall be for the Buyers' risk and expense. In the event    145
that the Buyers' work requires such additional time, the Sellers may upon completion of the    146
Sellers' work tender Notice of Readiness for delivery whilst the Vessel is still in drydock    147
and the Buyers shall be obliged to take delivery in accordance with Clause 3 , whether    148
the vessel is in drydock or not and irrespective of Clause 5 b).    149

*    Notes, if any, in the surveyor's report which are accepted by the classification Society    150
without condition/recommendation are not to be taken into account.    151

**    6a)and 6 b) are alternatives; delete whichever is not applicable. In the absence of deletions,    152
alternative 6 a) to apply.    153

7.    Spares/bunkers, etc.    154

The Sellers shall deliver the Vessel to the Buyers with everything belonging to her on board and on shore.    155
All spare parts and spare equipment including spare tail-end shaft(s) and/or spare propeller(s)/propeller    156
blade(s), if any, belonging to the Vessel at the time of inspection used or    157
unused, whether on board or not shall become the Buyers' property, but spares on order are to be    158
excluded. Forwarding charges, if any, shall be for the Buyers' account. The Sellers are not required to    159
replace spare parts including spare tail-end shaft(s) and spare propeller(s)/propeller blade(s) which    160
are taken out of spare and used as replacement prior to delivery, but the replaced items shall be the    161
property of the Buyers. The radio installation and navigational equipment shall be included in the sale    162
without extra payment if they are the property of the Sellers. Unused stores and provisions shall be    163
included in the sale and be taken over by the Buyers without extra payment.    164

The Sellers have the right to take ashore crockery, plates, cutlery, linen and other articles bearing the    165
Seller's flag or name, provided they replace same with similar unmarked items. Library, forms, etc.,    166
exclusively for use in the Sellers' vessel(s),shall be excluded without compensation. Captain's    167
Officers' and Crew's personal belongings  including the slop chest are to be excluded from the sale,    168
as well as  the following additional items (including items on hire):    169



The Buyers shall take over the remaining bunkers and unused all lubricating oils onboard including in ~~170~~
~~storage~~ ~~tanks~~ ~~and~~ 171
~~sealed drums~~ and pay the Sellers last net purchase price supported by copied vouchers or 172
redelivery prices charged by charterers.~~the current net marked price (excluding barging expenses) at~~ 173
~~the~~ ~~port~~ ~~and~~ ~~date~~ 174
~~of delivery of the Vessel.~~
Payment under this Clause shall be made at the same time and place and in the same currency as
the Purchase Price.

## 8.    Documentation. (see also clause 17)     175

The place of closing : In Sellers designated bank or Offices, Athens or Piraeus.     176

~~In exchange for payment of the Purchase Price the Sellers shall furnish the Buyers with delivery~~ 177
~~documents, namely:~~ 178

~~a) Legal Bill of Sale in a form recordable in~~ ~~(the country in which the Buyers are~~ 179
~~to register the Vessel), warranting that the Vessel is free from all encumbrances, mortgages~~ 180
~~and maritime liens or any other debts or claims whatsoever, duly notarially attested and~~ 181
~~legalized by the consul of such country or other competent authority.~~ 182

~~b) Current Certificate of Ownership issued by the competent authorities of the flag state of~~ 183
~~the Vessel.~~ 184

~~c) Confirmation of Class issued within 72 hours prior to delivery.~~     185

~~d) Current Certificate issued by the competent authorities stating that the Vessel is free from~~ 186
~~register encumbrances.~~ 187

~~e) Certificate of deletion of the Vessel from the Vessel's registry or other official evidence of~~ 188
~~deletion appropriate to the Vessel's registry at the time of delivery, or, in the event that the~~ 189
~~registry does not as a matter of practice issue such documentation immediately, a written~~ 190
~~undertaking by the Sellers to effect deletion from the Vessel's registry forthwith and furnish a~~ 191
~~Certificate or other official evidence of deletion to the Buyers promptly and latest within 4~~ 192
~~(four) weeks after the purchase Price has been paid and the Vessel has been delivered.~~ 193

~~f) Any such additional documents as may reasonably be required by the competent authorities~~ 194
~~for the purpose of registering the Vessel provided the Buyers notify the Sellers of any such~~ 195
~~documents as soon as possible after the date of this Agreement.~~ 196

At the time of delivery the Buyers and Sellers shall sign and deliver to each other a Protocol of 197
Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Sellers to the 198
Buyers. 199

At the time of delivery the Sellers shall hand to the Buyers or their Managers the classification 200
certificate(s)         as         well         as         all 201
plans etc., which are on board the Vessel. Other certificates which are on board the Vessel shall also 202
be handed over to the Buyers unless the Sellers are required to retain same, in which case the 203
Buyers   to   have   the   right   to   take   copies.   Other   technical   documentation   which   may 204
be in the Sellers' possession shall be promptly forwarded to the Buyers at Buyers expense, if they so 205
request. The Sellers may keep the Vessel's log books but the Buyers to have the right to take 206
copies of same.

## 9.  Encumbrances

207

The Sellers warrant that the Vessel, at the time of delivery, is free from all charters, encumbrances, 208
mortgages and maritime liens or any other debts whatsoever. The Sellers hereby undertake 209
to indemnify the Buyers against all consequences of claims made against the Vessel which have 210
been incurred prior to the time of delivery. 211



## 10. Taxes, etc.                                                                    212

Any taxes, fees and expenses in connection with the purchase and registration under the Buyers' flag
shall be for the Buyers account, where as similar charges in connection with the closing of the Sellers'
register shall be for the Sellers' account.                                          213
                                                                                      214
                                                                                      215

## 11. Condition on delivery                                                          216

The vessel shall be delivered to buyers with or without cargo, charter free or charter       217
Attached (see clause 5) in Sellers'option.                                           218
                                                                                      219
The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is     220
delivered to the Buyers, but subject to the terms and conditions of this Agreements she shall be        221
delivered and taken over as- is where is at the time of delivery with her Class maintained free of      222
recommendations and average damage. she was at the time of inspection, fair wear and tear excepted.     223
However, the Vessel shall be delivered with her class maintained without condition/recommendation*,     224
free of average damage affecting the Vessel's class, and with her classification certificates and       225
national certificates, as well as all other certificates the Vessel had at the time of inspection, valid and     226
unextended without condition/recommendation* by Class or relevant authorities at the time of            227
delivery.
"Inspection" in this Clause 11, shall mean the Buyers' inspection according to Clause 4 a) or 4 b). If   228
applicable, or the buyers inspection prior to the signing of this Agreement. If the Vessel is taken over 229
without inspection, the date of this Agreement shall be the relevant date.

*    Notes, if any, in the surveyor's reports which are accepted by the Classification Society
     without condition/recommendation are not to be taken into account.                230

                                                                                      231

## 12. Name/markings

Upon delivery the Buyers undertake to change the name of the Vessel and alter funnel markings.    232

                                                                                      233
                                                                                      234
## 13. Buyers' default                                                                235
                                                                                      236
Should the deposit not be paid in accordance with Clause 2, the Sellers have the right to cancel this    237
Agreement, and they shall be entitled to claim compensation for their losses and for all expenses       238
incurred together with interest.                                                     239
Should the Purchase Price not be paid in accordance with Clause 3, the Sellers have the right to
cancel the Agreement, in which case the deposit together with interest earned shall be released to the
Sellers. If the deposit does not cover their loss , the Sellers shall be entitled to claim further
compensation for their losses and for all expenses incurred together with interest.       240

                                                                                      241
                                                                                      242
## 14. Sellers' default                                                               243
                                                                                      244
Should the Sellers fail to give Notice of Readiness in accordance with Clause 5 a) or fail to be ready    245
to validly complete a legal transfer by the date stipulated in line 61 the Buyers shall have             246
the option of cancelling this Agreement provided always that the Sellers shall be granted a             247
maximum of 3 banking days after Notice of Readiness has been given to make arrangements                 248
for the documentation set out in Clause 8. If after Notice of Readiness has been given but before        249
the Buyers have taken delivery, the Vessel ceases to be physically ready for delivery and is not         250
made physically ready again in every respect by the date stipulated in line 61 and new Notice of         251
Readiness given, the Buyers shall retain their option to cancel. In the event that the Buyers elect       252
to cancel this Agreement the deposit together with interest earned shall be released to them            253
immediately.                                                                          254
Should the Sellers fail to give Notice of Readiness by the date stipulated in line 61 or fail to be ready
to validly complete a legal transfer as aforesaid they shall make due compensation to the Buyers for
their loss and for all expenses together with interest if their failure is due to proven
negligence and whether or not the Buyers cancel this Agreement.                       255

### 15. Buyers' representatives

256
257
258
After this Agreement has been signed by both parties and ~~the deposit has been lodged~~, the Buyers
have the right to place two representatives on board the Vessel at their sole risk and expense ~~upon
arrival at or as about~~

259
260
261

These representatives are on board for the purpose of familiarisation and in the capacity of
observers only, and they shall not interfere in any respect with the operation of the Vessel. The
Buyers' representatives shall sign the Sellers' letter of indemnity prior to their embarkation.

### 16.    Arbitration

262

a)* This Agreement shall be governed by and construed in accordance with English law and
any dispute arising out of this Agreement shall be referred to arbitration in London in
accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or
re-enactment thereof for the time being in force, one arbitrator being appointed by each
party. On the receipt by one party of the nomination in writing of the other party' s arbitrator,
that party shall appoint their arbitrator within fourteen days, failing which the decision of the
single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree
they shall appoint an umpire whose decision shall be final.

263
264
265
266
267
268
269
270

b)* ~~This Agreement shall be governed by and construed in accordance with Title 9 of the
United State Code and the Law of the State of New York and should any dispute arise out of
this Agreement, the matter in dispute shall be referred to three persons at New York, one to
be appointed by each of the parties hereto, and the third by the two so chosen; their
decision or that of any two of them shall be final, and for purpose of enforcing any award, this
Agreement may be made a rule of the Court.
The proceedings shall be conducted in accordance with the rules of the Society of Maritime
Arbitrators Inc. New York.~~

271
272
273
274
275
276
277
278

c)* ~~Any dispute arising out of this Agreement shall be referred to arbitration at~~
                                          ~~subject to the procedures applicable there,~~
~~The laws of~~                                   ~~shall govern this Agreement.~~

279
280
281

~~15a), 15b) and  16c)  are alternatives; delete whichever is not applicable.  In  the  absence of
deletions, alternative 16 a) to apply.~~
Additional claused 17-19 inclusive herebelow form an integral part of this Agreement and
shall be deemed to be fully incorporated herein.

282
283

17. Documentation: Sellers will provide Buyers with all documents reasonably required
for the purpose of the vessel's legal transfer of ownership and her registration under the
Liberian Flag. List of such documents to be agreed and to be incorporated in this MOA by
an Addendum.

18. This sale to be kept strictly private and confidential.

19. The present agreement between sellers and buyers is absolute and irrevocable and
can not be abandoned by either party.

The Sellers                              The Buyers

Copyright: Norwegian Shipbrokers' Association, Oslo, Norway
Printed and sold by S. Grøndahl A/S, Heddehem 4 Løren, Oslo, Norway
Fax. 47-22-25 25-63, Phone: 47-22-25 61 00

# EXHIBIT 3

## SIDE LETTER "A" TO THE MEMORANDUM OF AGREEMENT
## DATED 26th OCTOBER 2007 FOR THE SALE OF
## M/T "ELLI" ("MOA")

Pursuant to the terms and conditions of the aforementioned MOA between:

**Golden Fleece Maritime Inc of Liberia** (Sellers) and **Blanca Shipmanagement Company of Marshall Islands or another company TBN** (Buyers) it is further agreed between Sellers and Buyers that:

1.  It is hereby agreed that after December 15th 2007 00:01 local time, Buyers shall be entitled absolutely to all payments of hire made to or to be made by charterers and all such payments shall be the absolute property of the Buyers and shall be held by the Sellers on behalf of the Buyers. The Sellers shall promptly account to the Buyers thereof in full and without deduction or set-off.

2.  In the event that the vessel is delivered in the end of the time charter with IOC dated 8th December 2006 as extended or later to reach a convenient delivery port in accordance with clause 5b of the MOA, the Buyers shall pay to the Sellers without set-off or deduction upon receipt of a written request to do so, accompanied by copies of supporting documentation, such sum as represents the vessel's OPEX for the period between 15th December 2007 00:01 and the delivery date. Such OPEX currently is estimated to be in the region of USD 8,000 per day.

3.  Further, it is hereby agreed that after December 15th 2007 00:01 local time, Buyers are liable for all claims/losses and damage to the vessel. Should the vessel become an actual, constructive or compromised total loss after 15th December 2007 00.01 hrs and before the vessel's delivery to Buyers, the Buyers shall only be entitled to receive the 50% of any compensation from Hull and Machinery Policy and Increased Value Policy less the purchase price less any expenses incurred.

4.  Clause 9 of the MOA to which this side letter applies, ceases to be warranted by Sellers and becomes totally the responsibility of Buyers, after 00.01 of the 15th December 2007. Similarly clause 11 of the said MOA lines 218 and 219. The only exception to this clause is if the cause of the problem arises before 00.01 15th December 2007, in which case Sellers are responsible.

5.  Buyers irrevocably and unconditionally accept and warrant that after the delivery the vessel shall continue to be managed by LIQUIMAR TANKERS MANAGEMENT INC (having an office at 3, Alopekis street, Kolonaki, Athens, Greece). Any change regarding the vessel's management shall be decided by shareholders representing 100% of owners' shares. The terms and conditions of the Management Agreement shall be agreed between the Buyers and Liquimar Tankers Management Inc (Liquimar) by a separate Agreement but with terms similar to those that sellers currently have with Liquimar with only reasonable amendments to confront with the new realities of the Tanker Management Industry, if any. The management fee is agreed to be USD 550 per day for the first year and increased annually thereafter by 5%.

6.  From December 15th 2007, for any unpaid amount of the purchase price the Buyer shall be debited for the balance of the purchase price at a rate of Libor of the period till delivery plus 1% per annum pro rata which will be settled at delivery.

Signed this 26th day of October 2007

For the Sellers                                     For the Buyers

