UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

ST SHIPPING AND TRANSPORT, INC.,       :

           Plaintiff,           :      07 Civ. 11147 (SAS)

    - against -         :      ECF CASE

GOLDEN FLEECE MARITIME INC.,      :

          Defendant.        :

BLANCA SHIPMANAGEMENT COMPANY,  :

Third-Party Claimant,      :

----------------------------------------------------------- X

## SECOND DECLARATION OF DUNCAN MCDONALD
## IN SUPPORT OF MOTION TO VACATE

DUNCAN MCDONALD affirms and states the following under the penalties of perjury under the laws of the United States pursuant to 28 USC 1746:

1.    I am a solicitor of the Supreme Court of England and Wales and a partner in the law firm of Stephenson Harwood. I have already made one Declaration in this matter, dated 3 July 2008. My firm has acted on behalf of Golden Fleece Maritime Inc ("Golden Fleece") in the dispute between ST Shipping and Transport Inc ("ST Shipping") and Golden Fleece in respect of the Charterparty dated 30 May 2003 under the terms of which ST Shipping chartered the vessel "Elli" from Golden Fleece, since the dispute arose.

2.    I make this Declaration in support of the pending Motions to Vacate filed on behalf of Blanca Shipmanagement Company and Golden Fleece Maritime Inc in the above captioned matter.

3.    At the outset, I would like to reiterate my opinion that under English law: (1) Golden Fleece validly created a trust of all the charterparty hire on behalf of Blanca; (2) any funds

received into Golden Fleece's account under the charterparty would have been held by Golden Fleece as trustees for Blanca; and (3) Golden Fleece never obtained a beneficial proprietary interest in such funds, and thus the wires attached in this action (all of which represent payments under the charterparty), were wrongfully attached for any claims against Golden Fleece. Nothing in the Declaration of Mr Mills-Webb has caused me to alter my opinion.

## THE PARTIES' DISPUTES

4.    In his Declaration dated 17 July 2008 Mr Mills-Webb has asserted that the first part of his Declaration is necessary so the Court can understand ST Shipping's "*need for security*" in this action. I do not dispute that ST Shipping would like to obtain security, but so far as their alleged "*need*" is concerned, my comments are set out below.

5.    Under English law, ST Shipping have no right or automatic entitlement to security.

6.    There are no sums at all owing by Golden Fleece to ST Shipping. ST Shipping has, at best, a claim in arbitration. Such claim has not been proven and no Award has been made in respect thereof. It is Golden Fleece's position that ST Shipping's claim is without merit. Golden Fleece submitted their Defence and Counterclaim in the arbitration on 24 July 2008 and their primary case is that the vessel in fact over-performed (rather than underperformed, as alleged by ST Shipping) as a result of which ST Shipping must pay Golden Fleece the sum of US$469,110.50 (together with Golden Fleece's Counterclaim in the sum of US$1,278,873.10 plus interest). If Golden Fleece's primary case is not accepted by the arbitration Tribunal, on its alternative case the vessel's underperformance (in terms of damages/hire) is considerably less than the amount claimed by ST Shipping, and Golden Fleece would have to pay only US$160,888.57, rather the US$1,091,112.61 claimed by ST Shipping. This sum (US$160,888.57) would, however, be set off against Golden Fleece's Counterclaim of US$1,278,873.10 which would leave a balance of US$1,117,984.60 (plus interest) payable to Golden Fleece. In any event, ST Shipping have already been compensated for any alleged underperformance in respect of both speed and consumption from April 2005 to the end of the charter period by reason of the judgment of Mr Justice Cooke dated 2 August 2007 in the High Court action 2005 Folio 1090 and the damages awarded to ST Shipping by such Judgement. This is also set out in Golden Fleece's Defence and Counterclaim.

7.   Mr Mills-Webb has failed to inform the Court that at no time (either before or after the present Rule B attachment was obtained and either before or after the sale of the "Elli") has Golden Fleece failed to pay any sums adjudged due to ST Shipping. Indeed all such sums have been paid very promptly. As stated in paragraph 6 of Mr Mills-Webb's Declaration, on 2 August 2007 Mr Justice Cooke awarded judgment, together with costs, in favour of ST Shipping, to be paid by 20 August 2007. Both the Judgment sum and the costs were paid in full by such date. Further, the Court of Appeal dismissed Golden Fleece's appeal from Mr Justice Cooke's Judgment on 23 May 2008 and on 6 June ordered that Golden Fleece pay the costs of the appeal to ST Shipping by 20 June 2008. Once again, those costs were paid in full by the date ordered by the Court. It should be noted that in neither case was any security either requested by or provided to ST Shipping. I would specifically draw to the Court's attention that the judgment of the Court of Appeal dated 23 May 2008 was handed down (and the costs paid) several months after the "Elli" had been sold.

8.   At paragraph 8 of his declaration, Mr Mills-Webb has stated that when Golden Fleece agreed to sell the "Elli" in October 2007, Golden Fleece were seeking to appeal the High Court Judgement and that they had been informed that further claims would be pursued against them by ST Shipping in the London arbitration proceedings. This is factually correct but entirely irrelevant. Golden Fleece were entitled at all times to deal with the "Elli" as they wished. Mr Mills-Webb seems to be suggesting that the vessel was sold by Golden Fleece expressly to avoid putting up security and/or to make it more difficult for ST Shipping to enforce any future arbitration award. Mr Mills-Webb has not provided any evidence in support of this suggestion, which is unequivocally denied by Golden Fleece, who have confirmed to me that the vessel was sold in the ordinary course of business and without regard to any existing or future proceedings or arbitrations. The "Elli" is a single hulled tanker and was sold by Golden Fleece as a result of the increasing difficulties in trading such vessels in light of the changes in the Marpol regulations. Mr Mills-Webb is well aware of these difficulties which were the central issue in the proceedings in the High Court to which I have referred in paragraphs 6 and 7 above (action number 2005 Folio 1090) and to which Mr Mills-Webb refers in paragraphs 3-6 of his declaration. Further and as noted above, the fact that the vessel had already been sold did not affect the fact that the costs of the appeal were paid promptly to ST Shipping in June 2008.

9.   At paragraph 9 of his Declaration, Mr Mills-Webb has claimed that Golden Fleece "*failed to provide security for the claim voluntarily*". Golden Fleece did not "*fail*" to provide security: it declined to do so. Golden Fleece had (and has) under English law no obligation

whatsoever to provide security for ST Shipping's alleged claims, unless ordered to do so by the High Court or arbitration tribunal. No such order has been either made or requested.

10. With regard to paragraph 10 of his Declaration, Mr Mills-Webb's states that I did not indicate during our correspondence relating to the possibility of providing a letter of undertaking that "*the attached funds in New York were subject to a superior claim of any kind*". He is correct. There was absolutely no reason for or obligation upon me to do so. It was a matter for Golden Fleece/Blanca Shipmanagement to raise as and when they saw fit. I would add that the proposal by Golden Fleece to put up replacement security was made under protest and that Golden Fleece has never claimed a beneficial proprietary interest in the funds attached. Nor could it, since Golden Fleece at all times held the charterparty hire on behalf of Blanca.

11. For the sake of good order, I should mention two points on which Mr Mills-Webb's Declaration may have created a wrong impression to the Court.

11.1. In paragraph 6, he has stated that, in the Judgment of Mr Justice Cooke of 2 August 2007, Golden Fleece's claim was "*completely dismissed*" and that ST Shipping was awarded the full amount of its counterclaim. This is incorrect. In fact, ST Shipping were awarded their counterclaim, but Golden Fleece's claim for unpaid profit share was set off against and deducted from the damages awarded to ST Shipping, leaving a net balance payable to ST Shipping.

11.2. In paragraph 7, Mr Mills-Webb has stated that ST Shipping gave notice of a speed and consumption claim which is now in arbitration. In fact, the arbitration was commenced by Golden Fleece against ST Shipping. Ordinarily, Golden Fleece therefore would be the claimants in the arbitration, but ST Shipping served their alleged underperformance claims first, and accordingly Golden Fleece are counterclaimants. Golden Fleece are claiming (amongst other things) unpaid hire and sums payable in connection with the quantities of bunkers on board on redelivery under the charterparty as is apparent from the Defence and Counterclaim Submissions attached hereto. It is fair to say that ST Shipping have not pursued their claim with any haste: in spite of receiving copies of the log books 26 November and 12 December 2007, they did not serve their claim submissions until 1 May 2008.

**ENGLISH LAW**

12.   As I explain below, under English law, Blanca has the entire beneficial proprietary interest in the funds attached: Golden Fleece has none.

12.1.   The Side Letter gives rise to a trust, whereby the Sellers will hold all hire payments under the time charter with Indian Oil Corporation on trust for the Buyers. The hire, as trust property, is immune to claims by creditors of the Sellers.

12.2.   Mr Mills-Webb has asserted that the Side Letter constitutes an equitable assignment of the hire payments under the time charter. I do not agree, but even if he were correct, those hire payments cannot, under English law, be subject to any attachment or garnishment by any creditor of the Sellers, nor can they be subject to any Court order freezing the Sellers' assets.

13.   At paragraph 13 of his Declaration Mr Mills-Webb states:

> "*The key point is that the question of whether a trust has been created (as opposed to some other legal relationship, such as one that is merely contractual) turns principally on the factual issue of the parties' intent.*"

14.   This is not a correct statement of English law. The key issue is not the intent of the <u>parties</u>, but the intent of the <u>party creating the trust</u>. As Underhill and Hayton on Trusts (17th edition, 2006) state at p. 97 (copy attached):

> "*No technical expressions are necessary for the creation of an express trust, which may be created without the settler being aware of this, so long as he intends to create a state of affairs that can only be accomplished if he creates a trust.*"

15.   In paragraph 13 of his declaration Mr Mills-Webb makes references to what commercial parties "*normally*" do and how an instrument "*normally starts off*". He also sets out what "*typically*" a document "*should state*" (my emphasis). In paragraph 14, he states that neither the Memorandum of Agreement nor the Side Letter "*makes any explicit mention of a 'trust' arrangement*".

16.   This is true but irrelevant: as Mr Mills-Webb himself states (in paragraph 13), "*no special language is required*" to create a trust. Under English law there is no obligation on a person creating a trust to use any particular words. As noted above, the principle is that "no

technical expressions are necessary".  Underhill and Hayton on Trusts (17th edition, 2006) state (copy attached):

> "Whether an intention to create a trust is sufficiently evinced is in each case a question of interpretation" (p. 98)

> "The latitude of expression allowed to the creator of a trust is an instance of the maxim that 'Equity regards the intention rather than the form'. Wherever the intent to create a trust is apparent, it will (other matters being in order) be carried into effect, however crudely or elliptically it may have been expressed." (p. 99)

17. I consider that the wording of the Side Letter could hardly be clearer as to the intention of the parties thereto: it declares (clause 1) that the Buyers will be "entitled absolutely" to all hire, which shall be "the absolute property" of the Buyers and will be "held by the Sellers on behalf of the Buyers".  The Sellers are to "promptly account to the Buyers...in full and without deduction or set-off".  Under English law, this language clearly creates a trust in favour of the Buyers.

The language in my opinion clearly is inconsistent with an intention merely to "assign" the hire payments.  Assignment might be appropriate if, for example, the Buyer were taking some security rights, but there is no question of that here.  Rather, the Buyer clearly is intended to receive <u>absolutely</u> the hire payments which, for reasons which have been explained in the declaration of Nancy R. Peterson, were to continue to be received by Golden Fleece, but which were then to be held in trust and passed on directly to the Buyers.

18. In Gillespie and Paterson v City of Glasgow Bank and Liquidators (1879) 4 App Cas 632, the House of Lords considered whether a trust was created by the use of the words "for behoof of" (being much clearer wording than in the present case).  It held that a trust was created.  The Lord Chancellor stated:

> "My Lords, there is no magic ... in the use of the word "trust."  There may be half-a-dozen words in the English language which would bring about the same result as the use of the word "trust," and it appears to me that words which say that one person holds property "on behalf of" or "for behoof of" another, are words which come up to and satisfy the idea of the word "trust," just as much

as the word "trust" itself, if the circumstances of the case are consistent with that interpretation." (per Earl Cairns LC at p. 640)

19.    Under English law, where assets are subject to a trust, the effect is that the beneficiary (in this case, Blanca) has an "equitable proprietary interest" in the trust property and is the owner of the beneficial interest in the property and as such is "entitled to the full economic benefit of the property" (Underhill & Hayton on Trusts (17th edition, 2006), p. 4, copy attached). Where a freezing (Mareva) order over a trustee's private property also catches trust property, that order will normally be discharged by the Court in so far as it affects the trust property, because the trust property is an asset which the trustee holds for the benefit of another (Federal Bank of the Middle East v Hadkinson [2000] 1 WLR 1695).

### Certainty of beneficiaries

20.    In paragraph 14 of his Declaration Mr Mills-Webb states that "Under English law the beneficiary of the trust needs to be specifically identified in the instrument, otherwise a trust is void for uncertainty". This is incorrect if it is intended to be a statement of English law. The position is as follows.

21.    English law draws a distinction between fixed trusts and discretionary trusts. In a fixed trust, the trustees have no discretion as to who the beneficiaries will be, or how much they will receive. In a discretionary trust, the trustees do have such discretion (see Underhill and Hayton on Trusts (17th edition, 2006), pp. 84-85, copy attached). The circumstances in which a trust may be void because of uncertainty as to the beneficiaries differ according to whether the trust is a fixed or a discretionary trust (Underhill and Hayton on Trusts (17th edition, 2006), pp. 112-117, copy attached).

22.    The present trust is clearly a fixed trust: the trustees (ie the Sellers) have no discretion as to whom they will pay the hire.

23.    The position under English law as to certainty of beneficiaries under a fixed trust is confirmed by Underhill and Hayton on Trusts (17th edition, 2006), p. 112 (copy attached):

"A fixed trust is void unless at the outset it can be seen clearly that all the beneficiaries thereunder are ascertainable or will be ascertainable when the time comes under the trust to distribute capital or income."

24. The effect of this principle would be, for example, to render void a trust to divide a fund equally between dependants of persons currently or formerly employed by IBM (although even in that case the trust will be valid if a comprehensive list of beneficiaries can be drawn up so as to enable an equal division to be made). A trust also may be void under this principle where the class of beneficiaries is conceptually uncertain, eg *"my old friends"* or *"my business associates"* (Underhill and Hayton on Trusts (17th edition, 2006), p. 112, copy attached).

25. In practice, it is unusual for a fixed trust to be held to be void for uncertainty as to the beneficiaries. As Underhill and Hayton comment: *"Except where the potential number of beneficiaries is very high and the value of the trust fund relatively low it will usually be possible to draw up a comprehensive list of the persons ranking as beneficiaries at the time of distribution of the trust fund."* (p. 112, copy attached)

26. In the present case, the above issues do not even arise. There is no difficulty at all in identifying the beneficiary at the time when the hire is payable: it is the Buyers or (if a nomination has been made by the Buyers) the company nominated by them to receive the hire.

27. In paragraph 14 of his Declaration Mr Mills-Webb states:

> *"this method of nomination* [i.e. the possibility of Blanca nominating any other persons to be the beneficiary] *is not recognised under English law to create a valid trust unless there is a clearly defined class of persons from which the nomination as beneficiary can be made, per* <u>McPhail v Doulton</u> <u>*[1971] AC 424.*</u>"

28. It is not correct, as a matter of English law, that this method of nomination is not recognised as creating a valid trust unless there is a clearly defined class of beneficiary. The correct position is as stated in paragraph 23 above. Further, that is not the effect of <u>McPhail v Doulton</u> [1971] AC 424 (copy of headnote attached). That case is irrelevant to the present matter because <u>McPhail v Doulton</u> concerns uncertainty as to the beneficiaries of a <u>discretionary</u> trust, not a fixed trust. The issue in that case was the validity of a deed which transferred money to trustees to be used at their absolute discretion for the benefit of the staff of a company, their relatives and dependants. The potential beneficiaries were very numerous: when the trust was created, there were 1,300 employees. It was held that *"the trust is valid if it can be said with certainty that any given individual is or is not a*

*member of the class*" even if they are not specifically identified in the trust deed ([1971] AC 424 at 456 per Lord Wilberforce). The Court of Appeal subsequently applied that test and held that the trust was valid (*In re Baden's Deed Trusts (No 2) [1973]* Ch 9).

### Certainty of trust property

29.  At paragraph 15 of his Declaration, Mr Mills-Webb has stated that "*there must also be certainty as to the trust property in order for the trust to be valid under English law*". In my view the position is correctly stated by Underhill and Hayton on Trusts (17th edition, 2006), p. 97 (copy attached): "*It is sufficient if the settlor evinces with reasonable certainty ... the trust property*".

30.  In paragraph 15 of his Declaration, Mr Mills-Webb appears to suggest that the charter hire is not sufficiently clearly identified (although, as noted below, he appears to abandon this position later in his Declaration). This is a surprising conclusion. Mr. Mills-Webb is incorrect for the following reasons:

30.1.  Clause 1 of the Side Letter expressly provides that Buyers shall be entitled "*absolutely*" to "*all payments of hire to or to be made by charterers*" after 15th December 2007. (As I have mentioned in my first Declaration the reference to payments "*to*" charterers is clearly an error, as Buyers can have no rights over such payments.) There is no difficulty whatsoever in identifying the charter hire which is being referred to, as the very next clause (Clause 2) refers to the "*time charter with IOC dated 8th December 2006*". This is the only charterparty referred to in the Side Letter, and so far as I am aware, the only charterparty to which the reference conceivably could apply.

30.2.  Further, the heading of the Side Letter expressly states that it is a Side Letter to the Memorandum of Agreement dated 26th October 2007 for the sale of M/T "ELLI". Clause 5(b) of that Memorandum of Agreement refers to the "*current charter with Indian Oil Corporation dated December 8th, 2006*". This is the only charterparty referred to in the Memorandum of Agreement. It is clearly the charterparty being referred to.

30.3.  Further still, there is a clear cross-referencing between the contents of Clauses 1 and 2 of the Side Letter. Clause 2 of the Side Letter provides that if the vessel is delivered at the end of the time charter with IOC dated December 8th 2006, then Buyers shall pay the vessel's OPEX for the period after 15th December 2007. This payment of OPEX is clearly

the other side of the coin to the provision in Clause 1 whereby the Buyers will receive the charter hire for the period after 15th December 2007.

31.    In the circumstances, it is abundantly clear that the trust property is the hire payable to Golden Fleece by IOC under the time charter of the "ELLI" dated 8th December 2006, and I would bring to the Court's attention that in paragraph 19 of his Declaration Mr Mills-Webb clearly accepts (notwithstanding his suggestion that the trust property is not sufficiently identified) that the time charter hire under the 8th December 2006 charter is, in fact, sufficiently identified as the property. In that paragraph, in the course of suggesting that the Side Letter creates an assignment of hire (rather than the creation of a trust), Mr Mills-Webb has stated that it is an assignment of the future hire payments to be received by Golden Fleece from the charterparty, "*presumably*" being the existing charter with the Indian Oil Corp.

32.    Furthermore, it should be noted that English courts are very reluctant to find any instrument (including a trust) void for uncertainty. The general and often-repeated policy of the English Courts is that "*the starting point on any question of uncertainty must be that of the court's reluctance to hold an instrument void for uncertainty.*" (*Brown v Gould* [1972] Ch 53 at 56 per Megarry J).

33.    In paragraph 16 of his declaration, Mr Mills-Webb states:

> "*Part of the certainty required of the trust property is that it should be kept separate from other property which is not the subject matter of the trust ... There must be evidence that "the trust property being intended to be kept separate from other property of the trustee". If the trust property becomes mixed or lost with other property, then the trust must fail.*"

34.    Again, this is wrong. It is not the case under English law that if the trust property becomes mixed with other property, then the trust must fail. The position under English law is that a requirement to keep trust money separate is an indicator that there is a trust, but it is not essential to there being a trust (Underhill and Hayton on Trusts (17th edition, 2006), p. 101 (copy attached). Underhill and Hayton go on to state: "*The fact that a transaction contemplates the mingling of funds is..., not necessarily fatal to there being a trust.*" (p. 101). In the present case I consider it is very clear from the wording of the Side Letter, which expressly identifies the trust property and imposes an express obligation upon

Golden Fleece to account for sums received promptly, that the intention of the parties was to create a trust.

35.   At paragraph 16 of his declaration Mr Mills-Webb sets out an extract which he states (wrongly) is taken from the case of *Associated Alloys Pt Ltd v CAN 001 252 106 Pty Ltd* (2001) 74 ALJR.  In fact the extract is taken from the case of *Henry v Hammond* [1913] 2 KB 515 at p. 521.  The relevant passage provides:

> "*If on the other hand he is not bound to keep the money separate, but is entitled to mix it with his own money and deal with it as he pleases, and when called upon to hand over an equivalent sum of money, then, in my opinion, he is not a trustee of the money, but merely a debtor.*" (my emphasis)

That passage has no relevance whatsoever to the present case.  In the present case the Sellers are not entitled to deal with the hire "*as they please*", nor are they obliged only to hand it over "*when called upon*".  Clause 1 of the Side Letter provides that the Sellers shall "*promptly account to the Buyers*".

36.   Contrary to what Mr Mills-Webb has suggested, under English law a valid trust can exist if the trustee holds trust monies briefly in his own bank account before transmitting it to the beneficiary:

> "*A valid trust exists where B contracts with C that after receiving full consideration from C, if he receives proceeds of sale materialising from some specified future property he will hold it (or a specified percentage or fractional part thereof) on trust for C, though he can hold such money briefly in his own bank account before transmitting it on to C: such money belongs in equity to C from the moment received by B so that C has the benefit of the tracing rules.*" (Underhill and Hayton on Trusts (17th edition, 2006) at p. 101, copy attached).

That is exactly the position in the present case: the Side Letter provides that "*The Sellers shall promptly account to the Buyers*" (my emphasis).

**Trust for future property**

37.   At paragraph 17, Mr Mills-Webb has observed that the hire payable did not exist when the side letter was entered into.  He has also stated that a trust for future property is only valid

if the beneficiary provides consideration. He further states that *"no such consideration is stated on the face of the Side Letter"*.

38.   Mr Mills-Webb is correct that a trust for future property will be void unless created for consideration. However, he is mistaken in claiming that the consideration must be stated on the face of the Side Letter. There is no such requirement and I note that Mr Mills-Webb does not refer to any authority in support of such proposition. In any event, the consideration which the Buyers provided is their agreement to pay the OPEX, which is clearly stated on the face of the Side Letter, Clause 2 of which provides:

> *"the Buyers shall pay to the Sellers ... such sum as represents the vessel's OPEX for the period between 15th December 2007 00:01 and the delivery date."*

Further, consideration clearly was provided in the Memorandum of Agreement through the purchase of the "Elli", and the purchase price has been paid. For reasons explained in the declaration of Nancy R. Peterson, the Side Letter, together with the Memorandum of Agreement, formed an integral part of the commercial bargain entered into by the parties for the sale of the vessel.

39.   Therefore, the Buyers plainly have provided consideration, and accordingly the trust is valid.

**Equitable assignment**

40.   If, as Mr Mills-Webb contends, no valid trust arises, then the question is: what is the effect of the Side Letter? In Mr Mills-Webb's opinion (paragraphs 19-20), the Side Letter constitutes an equitable assignment of the hire payments. He has asserted that the consequences of this are as follows:

> *"Since Golden Fleece does not appear to have given notice of the assignment contained in the Side Letter to Indian Oil Company, then Golden Fleece will retain an interest in the hire payable under the charter, and that interest is subject to attachment or garnishment ... the pertinent point for present purposes is that in the hands of Golden Fleece, the hire payment would not be immune to claims from other creditors and Blanca (or TBN) would have no proprietary claim to the money."* (paragraph 20)

\LONLIVE\7145638.5

41. This is incorrect as a statement of English law in a number of respects. First, it is not up to Golden Fleece to give notice to Indian Oil Corporation: it is for the assignee to give notice, not an assignor.

42. Second, and more significantly, under English law it is not the case that Golden Fleece's interest is subject to attachment or garnishment. Thirdly, it is wrong to say that the hire payment would not be immune to claims from other creditors.

43. The position under English law is that, where there is an equitable assignment of a debt, then:

43.1. the debt cannot be subject to attachment or garnishment by any creditor of the assignor; and

43.2. the equitable assignment will take priority over any order freezing the assets of the assignor (Mareva injunction). Any such freezing order will usually be varied by the Court to allow the money to be paid to the equitable assignee.

43.3. where there is a bona fide commercial agreement which regulates how particular assets are to be dealt with, then ordinarily any freezing order will be varied to enable that agreement to be performed.

The authorities for these points are set out below.

44. In *In re General Horticultural Company, Ex parte Whitehouse (1886) 32 Ch D 512*, it was held that:

> "*A garnishee order ... binds only so much of the debt owing to the debtor from a third party as the debtor can honestly deal with at the time when the garnishee order nisi was obtained and served; consequently it is postponed to a prior equitable assignment of the debt, even in the absence of notice.*"
> (headnote, p. 512, copy attached)

45. This passage was subsequently applied in *Holt v Heatherfield* [1942] 2 KB 1 (copy of headnote and pages 6 and 14 attached). In that case, Chloride owed a debt to Partington. Partington assigned that debt to Holt, but did not give notice of the assignment to Chloride. A fourth party, Heatherfield, obtained a garnishee order against Partington in respect of the same sum. Holt also claimed that sum.

46.  The judge (Mr Justice Atkinson) held that *Holt* was entitled to the money. He held that (1) because no notice had been given the assignment took effect as an equitable assignment; and (2) the equitable assignment <u>prevented a garnishee order from being granted</u>. The judge stated:

> "*A judgment creditor stands only in the shoes of his debtor and can take only that which the debtor can honestly deal with at the time the order nisi is served ... the cases show that a creditor who has obtained a garnishee order is not in as good a position as a subsequent assignee.*" (p. 6)

> "*Bearing in mind these two results, first, that the assignment was a perfectly good equitable assignment ... and, secondly, that a judgment creditor is in no better position than the assignor and cannot garnishee anything which the assignor could not honestly deal with, it seems to me perfectly clear that the plaintiff's title is a good one, and I so decide. I hold that his claim to the money is good.*" (p. 14)

47.  Where there is a Court order freezing the assets of an equitable assignor (a Mareva injunction), then under English law the equitable assignment will take priority over the freezing order. The position is summarised in Steven Gee QC, *Commercial Injunctions* (5th edition, 2004), pp. 391-392 (copy attached):

> "*An equitable charge or assignment can be created by contract, and will be effective to create priority even though, in the case of a debt, it has not yet been notified to the debtor. If there is a bona fide commercial agreement which regulates how particular assets are to be dealt with, then ordinarily Mareva relief* [a freezing order] *will be varied to enable that agreement to be performed.*"

48.  Accordingly, even if (as Mr Mills-Webb has asserted) the Side Letter constitutes an equitable assignment of the charterparty hire, under English law the assignment will not be subject to attachment or garnishment by any creditor of Golden Fleece, and any order freezing the assets of Golden Fleece would be varied to allow payment of the hire to the Buyers or their nominee.

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct.

Executed in London on 4 August 2008.

DUNCAN MCDONALD

# Underhill and Hayton

Law Relating to Trusts and Trustees

Seventeenth Edition

General Editor

David Hayton
*LLB, LLD (Newcastle), MA, LLD (Cantab)*
*Justice of the Caribbean Court of Justice, Additional Bencher of Lincoln's*
*Inn and Fellow of King's College, London*

with

Paul Matthews
*BCL (Oxon), LLB, LLD (London)*
*Professor of Law, King's College, London, Solicitor of Withers London, and*
*HM Coroner City of London*

Charles Mitchell
*BA (Oxon), LLM, PhD (London)*
*Professor of Law, King's College, London*



LexisNexis®
Butterworths

## 1.1  *Preliminary terminology*

beneficiaries' claim that he must be taken to have performed his duty in the way that most furthers their interests.

(8)  The settlor also confers on a beneficiary an equitable proprietary interest in the trust property and its fruits, which enables the beneficiary to trace the product thereof[13] into the hands of the apparent owner and claim all or a proportionate part thereof as part of the trust fund that must be restored to the trust fund (or himself if an absolutely entitled beneficiary). If the product has depreciated in value the beneficiary will claim instead an equitable lien thereon as security for the amount due to be restored to the trust fund under the accounting process. A beneficiary's proprietary interest arises as soon as the settlor has transferred – or has done everything necessary to be done by him to transfer – title to the trust property to a trustee, but the personal obligations of trusteeship do not arise until the trustee has knowledge of the trust[14], yet does not disclaim the trusteeship[15]. A beneficiary's equitable proprietary interest in the trust property binds a third party to whom trust property is wrongfully transferred unless the latter proves that he has a defence such as bona fide purchaser of the legal title to such property without notice of the beneficiary's interest or protection under a statutory provision (eg conferring good title on a purchaser of land if he pays the purchase money to two trustees or a trust corporation)[16]. The third party does not take on the obligations of the trustee for the beneficiaries but must return the trust property to the trustee as soon as practicable after learning of the wrongful transfer and must account for what has happened to the property in his hands, eg receipt of income therefrom or selling the property to purchase another asset (requiring to be restored to the trust).

(9)  The owner of the beneficial interest in property is the person personally entitled to the full economic benefit of the property. A beneficiary with an equitable interest in property will normally have a beneficial interest, but can be a trustee of the equitable interest for others. The absolutely entitled legal owner of property is also the beneficial owner, but has no equitable interest[17] until there is separation of the legal interest from the equitable interest, so that one person owes a duty to another, there can be no equitable interest.

(10)  History is responsible for the terminology of a trustee owning a legal interest in property and beneficiaries owning equitable interests. The courts of the common law treated the trustee as full owner, but the Court of Chancery, presided over by the Lord Chancellor (originally the King's right-hand man) and acting on equitable principles so as to become known as the court of equity, compelled the trustee to manage the legal interest in the best interests of the beneficiaries, regarded as having

4

### 4.19 Preliminary terminology

can be distributed, perhaps with the trustee being expressly authorised to do this without the need to consider the interests of other beneficiaries, so that in practice there is no real likelihood of the independent trustee turning down a request for funds from the settlor, then the trust funds (like trust funds subject to a settlor having a power of revocation or a power to appoint to himself) can be regarded as an available resource of the settlor where claims of divorcing spouses are concerned. Thus, a spouse may have a substantial financial order made against her in the belief the trustees will put her in funds to relieve her of financial embarrassment[1]. The approach of the court is that trust capital (or income) will be a resource of the spouse within s 25(2)(a) of the Matrimonial Causes Act 1973 if the trustee would be likely to transfer the whole of the capital (or income) to the spouse if the spouse requested it[2].

[1]  *Browne v Browne* [1989] 1 FLR 291; and also see *Thomas v Thomas* [1995] 2 FLR 668 and a pair of Australian cases *Re Marriage of Goodwin* (1990) 14 Fam LR 801; *Re Marriage of Davidson* (1990) 14 Fam LR 817.
[2]  *Charman v Charman* [2005] EWCA Civ 1606, para 12, [2006] 1 WLR 1053.

4.20  However, such trust funds are not assets of the settlor for the purpose of satisfying claims of his creditors[1] and so no freezing injunction can be granted over such assets in aid of court proceedings against him by claimant creditors.

[1]  *Re Esteem Settlement* [2004] WTLR 1; *Shalson v Russo* [2003] WTLR 1165. There is no half-way house between a sham trust and a true trust.

4.21  Of course, the borderline is a narrow one between the case where an independent trustee in the exercise of its discretion will almost invariably exercise it in favour of the settlor-beneficiary when requested by him and the case where a nominee trustee will always exercise its discretion as directed by the settlor-beneficiary. If the court considers that there is good reason to suppose that a trust created by the defendant falls on the sham side of the borderline then it may grant a freezing injunction over the trust fund in aid of the claimant[1]. The court is likely to find such good reason where it appears that the defendant is seeking to hide or dissipate his assets via trusts and companies and Anstalts controlled by him[2].

[1]  *Dadourian Group International Inc v Azuri Ltd* [2005] EWHC 1768 (Ch), [2006] WTLR 239.
[2]  Piercing the veil of controlled companies is possible (eg *International Credit and Invest-ment Co (Overseas) Ltd v Adham* [1998] BCC 134, and *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177) but trusts are either fully legally controlled so as to be sham trusts or they are true trusts: see antepenultimate footnote.

## ARTICLE 5
### FIXED AND DISCRETIONARY TRUSTS

**5.1**

Beneficiaries have rights either under fixed trusts or discretionary trusts.

(1)  A fixed trust is a trust in which a beneficiary has a current fixed entitlement to an ascertainable part of the net income, if any, of

84

the trust fund after deduction of sums paid by the trustees in the exercise of their *administrative* powers of management: the beneficiary has an interest in possession under the trust.

(2) A discretionary trust is a trust in which a beneficiary has no such absolute current right to direct the trustees to pay him an ascertainable part of the net income. Typically, this is the case where a beneficiary will receive income only if the trustees positively decide to carry out their duty to distribute income by favouring him rather than another member of the class of potential beneficiaries. There is also the atypical case where a beneficiary must receive the income unless the trustees exercise *dispositive* (or *distributive*) powers to divert the income else-where (eg under a power to appoint income within six months of receiving it to charity) or to withhold it (eg a power to accumu-late income by adding it to the capital where there is no certainty that accumulations will ultimately pass to the beneficiary or his personal representatives): the discretion-conferring dispositive (or distributive) powers prevent an interest in possession arising (eg where B is a life tenant subject to dispositive powers)[1]. A discretionary trust will be exhaustive where all income *must* be distributed in the trustees' discretion amongst the class of benefi-ciaries: it will be non-exhaustive where all income must be distributed in the trustees' discretion amongst the class of benefi-ciaries *except* to the extent that income may be otherwise dealt with pursuant to a power in that behalf, eg a power of accumulation or a power to pay income to charity[2].

1  *Gartside v IRC* [1968] AC 553, [1968] 1 All ER 121; *Pearson v IRC* [1981] AC 753, [1980] 2 All ER 479, HL; *Re Trafford's Settlement* [1985] Ch 32, [1984] 1 All ER 1108 (present sole object of class of beneficiaries that was open and not closed has no interest in possession since another class member might come into existence before a reasonable time for the distribution of accrued income had elapsed); *Miller v IRC* [1987] STC 108.
2  *Sainsbury v IRC* [1970] Ch 712, [1969] 3 All ER 919.

*Significance*

5.2  The inheritance tax treatment of discretionary trusts is radically different from the treatment of fixed trusts[1]. Significant capital gains tax[2] and income tax[3] differences also exist. The test for certainty of beneficiaries for the validity of a trust differs according to whether the trust is a fixed trust or an 'atypical' discretionary trust on the one hand or a 'typical' discretionary trust on the other hand[4].

1  Inheritance Tax Act 1984, ss 49–84.
2  Taxation of Chargeable Gains Act 1992, ss 71, 72; where a life interest in possession is a narrower concept than an interest in possession.
3  Finance Act 1973, ss 16, 17 replaced by Income and Corporation Taxes Act 1988, ss 686, 687 as amended; *Corbett v IRC* [1938] 1 KB 567 at 577; *Baker v Archer-Shee* [1927] AC 844; *IRC v Miller* [1930] AC 222; *Hamilton Russell's Executors v IRC* [1943] 25 TC 200; *IRC v Berrill* [1982] 1 All ER 867, [1981] 1 WLR 1449.
4  *McPhail v Doulton* [1971] AC 424.

Chapter 3

# MATTERS ESSENTIAL TO THE PRIMA FACIE VALIDITY OF AN EXPRESS TRUST

*Article*

8   Language sufficient to create a trust for persons 8.1
9   The constitution of trusts 9.1
10  What property is capable of being made the subject of a trust 10.1
11  The legality of the expressed object of the trust 11.1
12  Necessity or otherwise of writing and signature 12.1

ARTICLE 8
LANGUAGE SUFFICIENT TO CREATE A TRUST FOR PERSONS

8.1

(1)   No technical expressions are necessary for the creation of an express trust, which may be created without the settlor being aware of this[1], so long as he intends to create a state of affairs that can only be accomplished if he creates a trust[2]. It is sufficient if the settlor evinces with reasonable certainty:

   (a)   an intent to create a trust, involving the trust property being intended to be kept separate from other property of the trustee[3];
   (b)   the trust property[4];
   (c)   the persons (individual or corporate) intended to be beneficiaries[5]; and
   (d)   the purpose of the trust so that the trust is administratively workable and not capricious[6];

providing always that for there to be a valid, and therefore enforceable, trust the trust must be intended to be directly or indirectly for the benefit of persons (individual or corporate) so that some person has locus standi to enforce the trust[7] unless the trust is for charitable purposes, when enforceable by the Attorney General or the Charity Commission, or for a limited anomalous number of non-charitable purposes relating to the maintenance of animals, tombs and the performance of private religious rituals[8], although there is scope[9] for

## 8.1  Matters essential to the prima facie validity of an express trust

the courts to uphold non-charitable purpose trusts if the settlor's trust instrument provides for a person with locus standi to enforce the purpose trust, assuming it to be workable and restricted to a valid perpetuity period.

(2) Whether an intention to create a trust is sufficiently evinced is in each case a question of interpretation. There is a well-established rule of construction that where an instrument is capable of two interpretations, one of which would give effect to the purpose of the person who drew it up, and the other of which would frustrate such purpose, one should prefer the former interpretation to the latter[10]. Whether or not[11] there is an intention to create a trust may be inferred from the context.

In particular:

(a) an apparent power of appointment among such of a class as the donee of the power may select, unaccompanied by a gift over in default of appointment[12], may raise an inference that a fixed trust was intended in favour of the class in default of appointment if there appears to be a general intention to benefit the objects of the power[13], alternatively, the apparent power may be treated as in the nature of a discretionary trust for the class members[14];

(b) a gift by will to a person, followed by precatory words expressive of the testator's request, recommendation, desire, hope or confidence, that the property will be applied in favour of others, may exceptionally create a trust, if, on the will as a whole, it appears that the testator intended the words to be imperative[15], but the court will not presume the imposition of a precatory trust merely from the presence of particular precatory words[16];

(c) a devise or bequest 'upon condition' or 'to the intent' that a benefit may be conferred on a third party, may create a trust for the third party if, on construing the whole will, the court comes to the conclusion that a trust, and not a charge merely, or a personal obligation, or a condition entailing forfeiture, was intended[17];

(d) a contract to create a trust of which specific performance would be ordered is considered to be an executory trust, conferring on parties who could sue for specific performance the same rights and imposing the same liabilities as if the contract had been actually performed[18].

(3) On the other hand, persons to whom payments are directed to be made by trustees are not necessarily beneficiaries, and cannot enforce such directions if the object of the payments, as gathered from the whole instrument, was not to confer benefits on the payees, but to facilitate the administration of an estate or to relieve the owner of trouble or inconvenience. In many cases the so-called trustee is regarded as an agent[19].

98





*Language sufficient to create a trust for persons*  8.8

'is not bound to keep the money separate, but is entitled to mix it with his own money and deal with it as he pleases, and when called upon to hand over an equivalent sum of money, then he is not a trustee of the money but merely a debtor.'[2]

1   See para 2.24 above and *Paragon Finance plc v Thakerar* [1999] 1 All ER 400 at 416, per Millett J; *Hinckley Singapore Trading Pte Ltd v Sogo Department Stores Pte Ltd* (2001) 4 ITELR 301 [Singapore CA]; *Re English & American Insurance Co Ltd* [1994] 1 BCLC 649; *Re Fleet Disposal Services Ltd* [1995] 1 BCLC 345; *Guardian Ocean Cargoes Ltd v Banco do Brasil* [1994] 2 Lloyd's Rep 152, CA.

2   *Henry v Hammond* [1913] 2 KB 515 at 521, endorsed by CA in *R v Clowes (No 2)* [1994] 2 All ER 316 at 325 and applied in *Commissioners of Customs and Excise v Richmond Theatre Management* [1995] STC 257.

8.7   A requirement to keep moneys separate is an indicator that they are impressed with a trust: the absence of such a requirement, if there are no other indicators of a trust, normally negatives it. The fact that a transaction contemplates the mingling of funds is, therefore, not necessarily fatal to a trust, eg where investors' moneys are to be held on trust for them as equitable tenants in common[1]. Similarly, a valid trust exists where B contracts with C that after receiving full consideration from C, if he receives proceeds of sale materialising from some specified future property he will hold it (or a specified percentage or fractional part thereof[2]) on trust for C, though he can hold such money briefly in his own bank account before transmitting it on to C: such money belongs in Equity to C from the moment received by B so that C has the benefit of the tracing rules[3]. The contract should spell out that the relevant amount of money is to be transferred into C's account or a trust account for C within a short period of receipt (eg five working days) and that B should not let the amount credited in its general account receiving the proceeds of sale fall below the relevant amount to be held on trust for C[4].

1   *Re Goldcorp Exchange Ltd* [1995] 1 AC 74, [1994] 2 All ER 806, PC; *R v Clowes (No 2)* [1994] 2 All ER 316, CA.

2   See *Associated Alloys Pty Ltd v ACN 001 452 106 Pty Ltd* (2001) 74 ALJR 862, para 1.42 above.

3   *Associated Alloys Pty Ltd v ACN 001 452 106 Pty Ltd* (2001) 74 ALJR 862 and *Re Irving* (1877) 7 Ch D 419; *Pullan v Koe* [1913] 1 Ch 9; *Re Gillott's Settlements* [1934] Ch 97; *Palette Shoes Pty Ltd v Krohn* (1937) 58 CLR 1, at 27.

4   *Royal Trust Bank v National Westminster Bank* [1996] 2 BCLC 682, CA; *Re Lewis' of Leicester* [1995] 1 BCLC 428. If, despite such terms, C ignores B's breach of them and, in practice allows B to use the money as B's own, then the trust will have been replaced with a debtor-creditor relationship.

## Trusts do not fail for want of a trustee

8.8   In the case of a will trust it matters not that the testator fails to appoint trustees[1] or that the appointed trustees predecease the testator[2] or disclaim the trust[3] or are not capable of taking the trust property[4]. The personal representatives will hold the property with power to appoint trustees who can then exercise all the powers vested in the trustees[5]. In the case of inter vivos trusts the settlor must do all that he can to vest the trust property in specific existing persons of full capacity[6] but disclaimer by them[7] or refusal of registration of

**8.41** *Matters essential to the prima facie validity of an express trust*

**8.41** On the other hand, a trust limited in the 1930s by reference to the life of the survivor of a large class, eg the descendants of Queen Victoria, is not void: it is merely difficult and expensive, but not actually impossible, to discover when such survivor dies[1]. For a royal lives perpetuity clause it is nowadays safer to use the descendants of King George VI.

: *Re Villar* [1929] 1 Ch 243, CA; and see *Re Leverhulme (No 2)* [1943] 2 All ER 274.

## Uncertainty as to beneficiaries under fixed trusts

**8.42** A fixed trust is void unless at the outset it can be seen clearly that *all* the beneficiaries thereunder are then ascertainable or will be ascertainable when the time comes under the trust to distribute capital or income[1]. Just as a trust for A for life remainder to B absolutely is valid, so is a trust for A (a bachelor) for life remainder to his children equally and a trust to divide a fund equally between such persons as shall on X's death be his statutory next of kin or his dependants. However, a trust to divide a fund equally between next of kin and dependants of persons currently or formerly employed by ICI plc or by any company on the board of which an ICI plc director currently sits will be void unless a comprehensive list of such beneficiaries can be drawn up so as to enable an equal division to be made[2]. Except where the potential number of beneficiaries is very high and the value of the trust fund relatively low[3] it will usually be possible to draw up a comprehensive list of the persons ranking as beneficiaries at the time for distribution of the trust fund. However, a small class may be void for conceptual uncertainty, eg a trust for 'my old friends' or 'my business associates' where no criteria can be ascertained from the trust instrument or other admissible evidence for determining exactly who can be old friends or business associates[4]. Thus a trust for equal division among 'my friends' will be void[5].

: *Re Gulbenkian's Settlement Trusts* [1970] AC 508 at 524, [1968] 3 All ER 785 at 793; *Kinsela v Caldwell* (1975) Austr LR 337; *Re Ahmed & Co* [2006] EWHC 480 (Ch) para 116, [2006] NLJR 512.
2 *IRC v Broadway Cottages Trusts* [1955] Ch 20, [1954] 3 All ER 120; *McPhail v Doulton* [1971] AC 424 at 450, [1970] 2 All ER 228 at 244f; *Re Sayer* [1957] Ch 423, [1956] 3 All ER 600.
3 *Re Gulbenkian's Settlement Trusts* [1970] AC 508 at 519, [1968] 3 All ER 785 at 788, HL. The court requires substantial probability that all the beneficiaries can be ascertained even if much difficulty and much expense is likely: *Re Saxone Shoe Co Ltd's Trusts Deed* [1962] 2 All ER 904, [1962] 1 WLR 943 not following *Re Eden* [1957] 2 All ER 430, [1957] 1 WLR 788.
4 *Re Baden's Deed Trusts (No 2)* [1973] Ch 9, [1972] 2 All ER 1304; *Brown v Gould* [1972] Ch 53, [1971] 2 All ER 1505; *Re Connor Estate* (1970) 10 DLR (3d) 5; *Re Bethel* (1971) 17 DLR (3d) 652; affd sub nom *Jones v Executive Officers of the T Eaton Co Ltd* (1973) 35 DLR (3d) 97; *Re Tuck's Settlement Trusts* [1978] Ch 49, [1978] 1 All ER 1047; *Re Tepper's Will Trusts* [1987] 1 All ER 970.
5 *Brown v Gould* [1972] Ch 53 at 57 and *Re Barlow's Will Trusts* [1979] 1 All ER 296 at 299, [1979] 1 WLR 278 at 281, 282. A fixed or discretionary trust for 'customers' would also seem void for uncertainty due to difficulties of distinguishing 'ex-customers': *Sparkes (1965) Ltd v Dommett* (1972) 116 Sol Jo 711, [1972] Times, 14 July, CA.

112



*Language sufficient to create a trust for persons* 8.45

*Uncertainty as to beneficiaries under discretionary trusts*

THE OLD TEST

8.43 Until the House of Lords' three to two majority decision in *McPhail v Doulton*[1] it was taken for granted that a trust, whether fixed or discretionary, was void for uncertainty if a comprehensive list of beneficiaries could not be drawn up[2]. After all, trusts are imperative: they must be carried out by trustees, though, in default, it must be possible for the court to enforce and carry out the trusts. If trustees failed to carry out discretionary trusts then, since it would be invidious and injudicious for the court to discriminate between the possible discretionary beneficiaries, the court would have to act on the maxim 'Equality is equity' and so distribute the trust fund equally between the beneficiaries. This is impossible unless a comprehensive list is capable of being drawn up so as to know into what number of shares to divide the fund equally.

> [1971] AC 424, [1970] 2 All ER 228; (1971) 87 LQR 31 (J W Harris); [1971] CLJ 68 (J A Hopkins); (1974) 37 MLR 643 (Y Grbich).
> 2   *Re Gulbenkian's Settlement Trusts* [1970] AC 508, [1968] 3 All ER 785.

THE NEW TEST: AS FOR OBJECTS OF FIDUCIARY POWERS OF APPOINTMENT

8.44 However, in *McPhail v Doulton* the House of Lords assimilated the test for uncertainty of beneficiaries under discretionary trusts to the test for certainty of objects under a mere power. Earlier in *Re Gulbenkian's Settlement Trusts*[1] the House of Lords had laid down that a mere power is valid, even though a comprehensive list of its objects cannot be drawn up, so long as it is possible to say with certainty of any given postulant that he definitely is an object of the power or that he definitely is not an object of the power.

> 1   [1970] AC 508, [1968] 3 All ER 785.

8.45 Indeed, a mere power will be void if, although one or a few persons can definitely be said to be within the power, there are persons of whom it cannot be said 'with certainty who is within and who is without the power'[1]. The underlying reasoning was that trustees with a mere power do not *have* to exercise it, so that the court cannot compel the trustees to exercise it: the objects of the power have a mere spes or hope of benefiting, and the persons entitled in default of exercise of the power have full equitable interests which entitle them to restrain the trustees from exercising the power in favour of persons outside the power. Thus, 'the trustees or the court must be able to say persons outside the power. Thus, 'the trustees or the court must be able to say with certainty who is within and who is without the power'[2]. In obiter dicta the House of Lords (Lord Reid reserving his position) clearly affirmed the comprehensive list test of certainty for beneficiaries under discretionary trusts, since such trusts have to be executed by the court in the event of default by the trustees, execution being impossible unless there can be equal division.

> :   [1970] AC 508 at 524, [1968] 3 All ER 785 at 794A per Lord Upjohn, with whom Lords Hodson and Guest concurred. It seems the possibility of the power being exercised to confer equal interests on all the objects is ignored in ascertaining the validity of the power. Any such exercise would presumably be void for capriciousness.

113



### 8.45  Matters essential to the prima facie validity of an express trust

2  [1970] AC 508 at 525. The authority of *Re Allen* Ch 810, [1953] 2 All ER 898, for the view that conceptual uncertainty does not vitiate conditions precedent is most doubtful in view of the favoured 'is or is not' approach of the House of Lords in *Gulbenkian* and in view of the views of Browne-Wilkinson J in *Re Barlow's Will Trusts* [1979] 1 All ER 296, paras 8.92–8.94 below.

8.46  In *McPhail v Doulton* Lords Hodson and Guest reaffirmed their view in *Re Gulbenkian's Settlement Trusts* but Lord Wilberforce (with whom Lord Reid and Viscount Dilhorne concurred) held that the test for certainty of beneficiaries under discretionary trusts should be assimilated to the 'is or is not' test for certainty of objects under a mere power: after all, in practical substance there is very little difference between the position of objects of a discretionary power and beneficiaries under a discretionary trust: they only have a hope of benefiting, though the hopes of beneficiaries will normally be higher than the hopes of objects of powers of appointment (unless favoured in a letter of wishes)[1]. Lord Wilberforce relied on certain 18th century cases for the proposition that execution by the court does not require equal division, especially where equal division is surely the last thing the settlor ever intended[2]. Referring to the discretionary trust in question as a 'trust power' (as opposed to a mere power) he laid down[3]:

'In the case of a trust power, if the trustees do not exercise it, the court will do so in the manner best calculated to give effect to the settlor's or testator's intentions. It may do so by appointing new trustees, or by authorising or directing representative persons of the classes of beneficiaries to prepare a scheme for distribution, or even, should the proper basis for distribution appear, by itself directing the trustees so to distribute.'

1  Further see *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26, [2003] 2 AC 709, paras 40–42.
2  The comprehensive list that will only apply at the end of the trust period if the discretionary trust instrument reveals that the settlor requires equal division at the end of the trust period.
3  [1971] AC 424 at 457, [1970] 2 All ER 228 at 247b; *Re Locker's Settlement Trusts* [1978] 1 All ER 216 at 219. Lord Wilberforce [1971] AC 424 at 449 accepted that it was 'legally correct' to say that there is no obligation to exercise a mere power and that no court will intervene to compel it, whereas a trust is mandatory and its execution may be compelled'. This passage was endorsed by Lord Walker in *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26, [2003] 2 AC 709, para 39, but see paras 42 and 51.

8.47  Having stated the law, Lord Wilberforce then remitted the case to the High Court[1], whence an appeal was made to the Court of Appeal[2], for a determination whether the discretionary trust in question was valid or void for uncertainty. Certain problems then emerged as to the proper scope of what, at first sight, seems a simple clear test.

1  *Re Baden's Deed Trusts (No 2)* [1972] Ch 607, [1971] 3 All ER 985.
2  [1973] Ch 9, [1972] 2 All ER 1304.

### SCOPE OF THE NEW TEST

8.48  The discretionary trust in question was for the trustees to make 'at their absolute discretion grants to or for the benefit of any of the officers and employees or ex-officers or ex-employees of the Company or to any relatives

114



*Language sufficient to create a trust for persons*  8.51

or dependants of any such persons in such amounts at such times and on such conditions (if any) as they think fit'. When the trust was created the company had about 1,300 officers and employees, the company having been incorporated 14 years previously in 1927. It became clear that the trustees could not trace numbers of short-term ex-employees (who had moved on since 1927) or, therefore, their relatives and dependants[1].

[1] [1972] Ch 607. Where the discretionary trust is for future as well as existing persons it must be restricted to the perpetuity period or reliance must be placed on Perpetuities and Accumulations Act 1964: see paras 11.17–11.18 below.

8.49 In the Court of Appeal, Stamp LJ took the view that the 'is or is not' test, for certainty of beneficiaries under discretionary trusts and of objects under powers, required that the court must be able to say of any given postulant that he definitely *is* a member of the class of beneficiaries or he definitely is *not* such a member, ie the name of any given person must be capable of being put either in a 'Yes' box or a 'No' box. Thus, a discretionary trust would be void if it was impossible to say of a given postulant either that he was or that he was not a member of the beneficial class, ie if his name had to be put into a 'Don't know' box. Accordingly, if 'relative' meant descendant of a common ancestor, so that A was a relative of B if at some time over hundreds or thousands of years they both traced their descent from a common ancestor, the discretionary trust would be void. Whilst many persons definitely would be relatives within the 'Yes' box there would be an infinitely greater number of persons, neither known to be relatives nor known to be non-relatives, needing to be placed within the 'Don't know' box. The apparently clear concept thus turned out, in effect, to be an uncertain 'grey' concept. However, Stamp LJ was prepared to treat relatives as meaning statutory next of kin in which case any given postulant would be bound to fall within the 'Yes' box or the 'No' box. 'Dependants' created no problems of conceptual certainty, only of evidential certainty, which of itself does not invalidate a trust since the court can always resolve the matter on the evidence presented to it on an application for directions.

8.50 Sachs and Megaw LJJ disagreed with Stamp LJ on the issue of 'relatives'. Sachs LJ took the robust practical view that the expression 'relatives' in its broadest sense would not cause the slightest difficulty in practice since the trustees would not distribute to a person who failed to prove he was a relative: if a person is not proved to be within the class of relatives then he is not in it.

8.51 Megaw LJ endorsed this. He also pointed out, first, that, since *McPhail v Doulton*, a discretionary trust does not fail simply because it is impossible to ascertain every member of the class of beneficiaries and to draw up a comprehensive list thereof. Second, the view of Stamp LJ that the 'is or is not' test means that a discretionary trust will fail if it cannot be shown of any individual that he definitely is *or definitely is not* a member of the class, is to contend 'in substance and reality that it does fail simply because it is impossible to ascertain every member of the class'[1]. With respect, this second point seems fallacious since in ascertaining whether *any* (as opposed to every)

115

### 8.51  *Matters essential to the prima facie validity of an express trust*

individual *is or is* not a member of the class it is not necessary to ascertain *every* member of the class and draw up a comprehensive list, eg if there are roughly 5,000 potential class members the trustees need only survey each of say 2,000 individuals placing each of them definitely inside or definitely outside the discretionary class according to clear conceptual criteria.

: [1973] Ch 9 at 23, [1972] 2 All ER 1305 at 1313.

8.52  Be that as it may, Megaw LJ went on to say[1]:

'In my judgment, much too great emphasis is placed on the words "or is not". To my mind, the test is satisfied if, as regards at least a substantial number of objects, it can be said with certainty that they fall within the trust, even though as regards a substantial number of other persons, if that ever for some fanciful reason fell to be considered, the answer would have to be, not "they are outside the trust", but "it is not proven whether they are in or out". What is a "substantial number" may well be a question of common sense and of some degree in relation to the particular trust; particularly where, as here, it would be fantasy, to use a mild word, to suggest that any practical difficulty would arise in the fair, proper and sensible administration of this trust in respect of relatives and dependants.'

1  [1973] Ch 9 at 24, [1972] 2 All ER 1305 at 1313.

8.53  Two comments may be made on the above remarks. First, is it wrong to emphasise the need to ascertain those who are not class members when a person alleging a breach of trust will need to show that the trustees distributed to an individual who was not a class member? Second, the rule that a discretionary trust is valid if a 'substantial' number of persons can be placed in the 'Yes' box of clear beneficiaries, even though a substantial number have to be placed in the 'Don't know' box of persons of whom it cannot be said they *are* beneficiaries or they are *not* beneficiaries, introduces uncertainty into the test of certainty of beneficiaries. Apart from the obvious uncertainty *in* the word 'substantial' does the rule operate to validate a discretionary trust as in *McPhail v Doulton* but to which there was added a conceptually uncertain clause such as 'any other person to whom I may be under a moral obligation and any of my old friends'[1]? Moreover, it is not so far removed from the view rejected by the House of Lords in *Re Gulbenkian's Settlement Trusts*[2] ie relation to powers (and so in relation to discretionary trusts by *McPhail v Doulton*)[3] namely the view[4] that a power (or discretionary trust) is valid if the trustees can say with certainty of any one person or any few persons[5] that he or they are within the scope of the power (or discretionary trust), though uncertainty exists as to whether other persons are within or without the power (or discretionary trust).

1  Alternatively, may the court have power to strike out the offending concept and sever it from the valid concepts within the class or classes of beneficiaries? Cf *Re Leek* [1969] 3 Ch 563 at 586; *Re Gulbenkian's Settlement Trusts* [1968] Ch 126 at 138. The orthodox view is that there is no authority in the trustees or the court to make any distribution among a smaller class than that pointed out by the donor: *Whishaw v Stephens* [1970] AC 508 at 524, sub nom *Re Gulbenkian's Settlement Trusts* [1968] 3 All ER 785 at 792, HL, per Lord Upjohn, with whom Lords Hodson and Guest concurred; *McPhail v Doulton* [1971] AC 424 at 456, [1970] 2 All ER 228 at 246, HL per Lord Wilberforce. Consider also the implications of the views of Megaw LJ for cases like *Re Astor's Settlement Trusts* [1952] Ch 534, [1952] 1 All ER 1067, where a substantial number of persons came within

116

*Language sufficient to create a trust for persons*   8.55

clause 7(b) for the relief or benefit of persons, or families or dependants thereof, actually or formerly engaged in journalism or in the newspaper business or any branch thereof, applied by the Court of Appeal in *Re Wright's Will Trusts* (21 July 1982) reported in (1999) 13 Trust L I 48.
2   [1970] AC 508 at 524, [1968] 3 All ER 785 at 794.
3   [1971] AC 424, [1970] 2 All ER 228.
4   *Re Gulbenkian's Settlement Trusts* [1968] Ch 126, [1967] 3 All ER 15, CA.
5   Megaw LJ in *Re Baden's Deed Trusts (No 2)* [1973] Ch 9 at 24; [1972] 2 All ER 1304 at 1313, treats the rejected view as concerning one single person being within the power or the trust but Lord Upjohn in *Re Gulbenkian's Settlement Trusts* [1970] AC 508 at 524, [1968] 3 All ER 785 at 792, in his example of two or three individuals being clearly 'old friends' treats the rejected view as concerning one or a few persons clearly within a power or trust.

8.54   Ultimately, everything must hinge upon how the court will deal with B's allegation that the trustees wrongfully paid income to X, whom B alleges is not a relative of S, where there is no evidence capable of proving whether or not X is a relative. If the evidential burden of proof rests on B as well as the legal burden of proof[1] so that the trustees are free to pay income to X or, indeed, to any Tom, Dick or Harry since it is impossible to prove that they are not relatives of S through some possible ancient common ancestor, then the 'trust' should be void for uncertainty and 'administrative unworkability. However, if the evidential burden of proof rests on the trustees once B has provided prima facie evidence that X is not a relative, then the trust will be valid, since the trustees will be under an enforceable duty to pay only those who can produce the relevant birth and marriage certificates. This justifies the majority view of Sachs and Megaw LJJ who endorsed the views of Brightman J at first instance when he had pointed out[2]. 'A supposed relative to whom a grant is contemplated would, in strictness, be bound to produce the relevant birth and marriage certificates or other sufficient evidence to prove his or her relationship. If the relationship is sufficiently proved the trustees will be entitled to make the grant. If no sufficient evidence can be produced the trustees would have no option but to decline to make a grant.'

1   On legal and evidential burdens see *Cross on Evidence* (Ninth edn) Ch 4.
2   [1972] Ch 607 at 626, [1973] 3 All ER 985 at 995.

8.55   The case with which common ancestry can be traced back many thousands of years by DNA testing makes it necessary for a settlor or testator not to create a discretionary trust or power for his relatives generally, which could extend to an unworkable[1].100 million Europeans, but to restrict them in some way to descendants of a designated ancestor alive 100 years ago or so. Old trusts, for relatives, like those in *McPhail v Doulton*, should remain valid[2].

1   Two and a half million members of a class made a discretionary trust for such class void for administrative unworkability in *R v District Auditor, ex p West Yorkshire MCC* [1986] RVR 24, (2001) WTLR 785. In *Re Baden's Deed Trusts (No 2)* [1973] Ch 9 at 20 it appears counsel disclaimed any reliance on the class being so large as to be unworkable. If advertising under s 27 of the Trustee Act 1925 or as directed by the court led to a workable group of relatives being known to the trustees then, perhaps, the discretionary trust could be upheld.
2   See para 8.91.

[1971] A.C. 424
1970 WL 29638 (HL), [1971] A.C. 424, [1970] 2 All E.R. 228, [1970] 2 W.L.R. 1110, (1970) 114 S.J. 375
(Cite as: [1971] A.C. 424)

\*424 McPhail and Others Appellants v. Doulton
and Others Respondents
[1970] 2 W.L.R. 1110

House of Lords

HL

Lord Reid , Lord Hodson , Lord Guest ,
Viscount Dilhorne
and Lord Wilberforce

1970 Jan. 13, 14, 15, 19, 20, 21; May 6

[On Appeal from In Re Baden's Deed Trusts,
Baden and Others v. Smith and
Others]

Trusts--Discretionary--Power of selection--Fund
for employees--Trustees ' shall' apply income-
-Trustees not bound to exhaust income of any
year--Power to apply accumulations as though in-
come--Whether trust or power--Whether same or
different test applicable in determining validity.

A deed recited that a settlor would transfer to
trustees shares in a company to form the nucleus
of a fund for the benefit of the staff of the com-
pany, their relatives and dependants. Clause 9
provided:
'(a) The trustees shall apply the net income of
the fund in making at their absolute discretion
grants ... in such amounts at such times and on
such conditions (if any) as they think fit ... (b)
The trustees shall not be bound to exhaust the in-
come of any year or other period in making such
grants ... and any income not so applied shall be
... [placed in a bank or invested]. (c) The \*425
trustees may realise any investments representing
accumulations of income and apply the proceeds
as though the same were income of the fund and
may also ... at any time prior to the liquidation of
the fund realise any other part of the capital of the
fund ... in order to provide benefits for which the
current income of the fund is insufficient.'

Clause 10 provided that all benefits being at the

discretion of the trustees, no person had any in-
terest in the fund otherwise than pursuant to the
exercise of such discretion.

The appellants, the settlor's executors, alleged
that the deed was wholly void and claimed pay-
ment of the fund to his estate and the respondent
trustees took out a summons, joining, inter alia,
the appellants as defendants, for determination of
certain questions on the construction of the deed.
On the main question of validity, Goff J. held that
the provisions of clause 9 (a) constituted a power
and not a trust and that on this footing clause 9
(a) was valid.

On appeal, the Court of Appeal, by a majority,
upheld the decision in favour of a power, but held
also that the judge had applied the wrong test for
the validity of powers, the correct test being that
stated (subsequent to his decision) by the House
of Lords in In re Gulbenkian's Settlements, and
accordingly the case was remitted to the Chan-
cery Division for reconsideration of the validity
of clause 9 (a) as a power. The appellants ap-
pealed:-

Held, allowing the appeal,
(1) that the provisions of clause 9 (a) consti-
tuted a trust and that the case would be remitted
to the Chancery Division for determination
whether on this basis clause 9 was (subject to the
effects of section 164 of the Law of Property Act,
1925 ) valid or void for uncertainty (post,
pp. 437E, 444A, B-C, 446H - 447A, 449H -
(2) (Lord Hodson and Lord Guest dissenting)
That the test to be applied in determining the
validity of trust powers was that propounded in In
re Gulbenkian's Settlements for powers,
namely, that the trust was valid if it could be said
with certainty that any given individual was or
was not a member of the class (post. pp. 437E,
446H - 447A, 456B, C).

In re Gulbenkian's Settlements [1970] A.C. 508;
[1968] 3 W.L.R. 1127; [1968] 3 All E.R.
785 , H.L.(E.) applied.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 2

[1971] A.C. 424
1970 WL 29638 (HL), [1971] A.C. 424, [1970] 2 All E.R. 228, [1970] 2 W.L.R. 1110, (1970) 114 S.J. 375
(Cite as: [1971] A.C. 424)

Inland Revenue Commissioners v. Broadway Cottages Trust [1955] Ch. 20; [1954] 3 W.L.R. 438; [1954] 3 All E.R. 120 , C.A. over- ruled.

*Per* Lord Reid, Viscount Dilhorne and Lord Wilberforce. Assimilation of the validity test does not involve the complete assimilation of trust powers with powers. As to powers, although the trustees may, and normally will, be under a fiduciary duty to consider whether or in what way they should exercise their power, the court will not normally compel its exercise. It will intervene if the trustees exceed their power and possibly if they are proved to have exercised it capriciously. But in the case of a trust power, if the trustees do not exercise it, the court will do so in the manner best thought to give effect to the settlor's or testator's intentions (post, pp. 456G - 457B).

Decision of the Court of Appeal [1969] 2 Ch. 388; [1969] 3 W.L.R. 12; [1969] 1 All E.R. 1016 , C.A. reversed.

The following cases are referred to in their Lordships' opinions:

Benjamin, In re [1902] 1 Ch. 723 .

*426 Blight v. Hartnoll (1881) 19 Ch.D. 294 .

Brown v. Higgs (1803) 8 Ves.Jr. 561, H.L.(E.)

Brunsden v. Woolredge (1765) 1 Amb. 507 .

Clarke v. Turner (1694) Free.Ch. 198.

Gestetner Settlement, In re [1953] Ch. 672; [1953] 2 W.L.R. 1033; [1953] 1 All E.R. 1150 .

Gisborne v. Gisborne (1877) 2 App.Cas. 300, H.L.(E.)

Gower v. Mainwaring (1750) 2 Ves.Sen. 87 .

Gulbenkian's Settlements, In re [1970] A.C. 508; [1968] 3 W.L.R. 1127; [1968] 3 All E.R. 785 , H.L.(E.).

Hain's Settlement, In re [1961] 1 W.L.R. 440; [1961] 1 All E.R. 848, C.A.

Harding v. Glyn (1739) 1 Atk. 469 .

Hewett v. Hewett (1765) 2 Ed. 332.

Hodges, In re (1878) 7 Ch.D. 754 .

Inland Revenue Commissioners v. Broadway Cottages Trust [1955] Ch. 20; [1954] 3 W.L.R. 438; [1954] 3 All E.R. 120, C.A.

Kemp v. Kemp (1801) 5 Ves.Jr. 849 .

Liley v. Hey (1842) 1 Hare 580 .

Marlborough (Duke of) v. Lord Godolphin (1750) 2 Ves.Sen. 61 .

Morice v. Bishop of Durham (1805) 10 Ves.Jr. 522 .

Mosely v. Moseley (1673) Fin. 53.

Ogden (H. J.), In re [1933] Ch. 678 .

Richardson v. Chapman (1760) 7 Bro.P.C. 318, H.L.(E.)

Supple v. Lowson (1773) 2 Amb. 729 .

Tempest v. Lord Camoys (1882) 21 Ch.D. 571, C.A.

Warburton v. Warburton (1702) 4 Bro.P.C. 1 , H.L.(E.).

The following additional cases were cited in argument:

Cameron v. Inland Revenue Commissioner [1964] N.Z.L.R. 936; [1965] N.Z.L.R. 1017 (New Zealand).

Combe, In re [1925] Ch. 210 .

Gess, In re [1942] Ch. 37 .

Knapp's Trust Funds, In re (Note) [1952] 1 All E.R. 458 .

Leek decd., In re [1967] Ch. 1061; [1967] 3 W.L.R. 576; [1967] 2 All E.R. 1160 ;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

WestlawUK

(1886) L.R. 32 Ch.D. 512
1886 WL 14223 (Ch D), (1886) LR 32 Ch. D. 512
(Cite as: (1886) LR 32 Ch. D. 512)

**\*512** In Re General Horticultural Company ex
parte. Whitehouse

Chancery Division

Ch D

Chitty, J.

1886 April 14

Garnishee Order--Equitable Charge--Priority No-
tice--Rules of Supreme Court, 1883, Order.
XLV., r. 1.

A garnishee order under Rules of Supreme Court,
1883, Order XLV., binds only so much of the
debt owing to the debtor from third party as the
debtor can honestly deal with at the time the gar-
nishee order nisi was obtained and served; con-
sequently it is postponed to prior equitable as-
signment of the debt, even in the absence of no-
tice.

ADJOURNED SUMMONS.

This was an application to settle the priorities of
certain incumbrancers on a sum of £245 1s. 3d. in
the hands of the liquidator of the above-named
company which had been duly allowed to one
John Wills in the winding-up for work done by
him for the liquidator, and which he had charged
as follows:

By a memorandum in writing of the 26th of June,
1884, John Wills charged the said debt of £245
1s. 3d. in favour of Messrs. Withall & Co. with
the repayment of £81 9s. 8d. On the 8th of Au-
gust, 1884, notice of this charge was given in
writing by the said Messrs. Withall & Co. to the
official liquidator. By two memoranda in writing,
both dated the 7th of July, 1884, John Wills also
charged the said sum of £245 1s. 3d. in favour of
Charles Hillier and S. V. Segar respectively with
the repayment of £100 and £70.

On the 24th of July, 1884, one Whitehouse re-
covered judgment against the said John Wills in

the Queen's Bench Division for £158 17s. 2d. No-
tice of this judgment was served on the official li-
quidator on the 8th of August, 1884.

On the 25th of November, 1885, Whitehouse ob-
tained a garnishee order nisi under the Rules of
the Supreme Court, 1883, order XLV. rule 1, at-
taching the said debt of £245 1s. 3d. due to John
Wills from the company, and served the order on
the following day. The order nisi was made re-
turnable for the 4th of December, when the Mas-
ter, having first made the order absolute on the
production of an affidavit of consent by John
Wills, **\*513** subsequently struck out his enforce-
ment on the order and wrote: "Discharged-
-Company winding-up. Apply to Chief Clerk."
Whitehouse did not appeal from this order or take
any further steps to enforce his garnishee order
till the 22nd of January, 1886, when the present
summons was issued in the winding-up claiming
payment of his debt and to enforce his attach-
ment. On the 26th of January, 1886, notice in
writing of Hillier and Segar's charges was given
to the official liquidator. Two other summonses,
one by Messrs. Withall & Co. and one by Hillier
and Segar, had also been issued to enforce their
respective charges, but by arrangement they had
been amalgamated and all came on for argument
together. It was admitted that Messrs. Withall &
Co.'s claim for £81 9s. 8d. had priority over all
the other charges, and the only point argued was
whether Whitehouse's judgment and garnishee or-
der nisi had priority over the respective charges
of Hillier and Segar. Whitehouse made an affi-
davit to the effect that he had had no notice of the
previous charges.

D. L. Alexander, for Messrs. Withall & Co. , was
not called upon to support his claim.

Charles Browne, for Mr. Whitehouse:--

Whitehouse had no notice of any prior charges at
the time he recovered judgment in the Queen's
Bench Division or when the garnishee order nisi
was obtained. The liquidator had notice of my
judgment in August, 1884, five months before he
received notice of Hillier and Segar's debts, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1886) L.R. 32 Ch.D. 512
1886 WL 14223 (Ch D), (1886) LR 32 Ch. D. 512
**(Cite as: (1886) LR 32 Ch. D. 512)**

for that reason *Whitehouse* ought to have priority. The garnishee order *nisi* under Order XLV., rule 1, is binding from the date of service; the property in the debt was transferred and there was a complete and perfect security the moment the order was served: Ex parte Joselyne [FN1]. The fact that the order nisi has not been made absolute makes no difference: Ex parte Joselyne; it is absolute against the debtor. The Master only refused to make it absolute because the company was in liquidation and he therefore considered application should be made in the winding-up. Under *514 these circumstances *Whitehouse's* claim must prevail over all the other incumbrancers except Messrs. *Withall & Co.*

FN1 8 Ch. D. 327.

*Haldane,* for *Hillier* and *Segar:*—

We do not admit that *Whitehouse* never received notice of these charges; further, I say the garnishee order was discharged; still, even if the garnishee order were absolute, it can only affect what the debtor could honestly deal with: Gill v. Continental Union Gas Company [FN2]: Hirsch v. Coates [FN3]. The doctrine of notice or no notice or priority of notice does not affect the question: Pickering v. Ilfracombe Railway Company [FN4]; Scott v. Lord Hastings [FN5]; Robinson v. Nesbitt [FN6]. The garnishee order therefore does not affect us as prior incumbrancers. True the authorities for the proposition are under 1 & 2 Vice. c. 110, and the Common Law Procedure Act, 1854, but Order XLV. regulating the present practice as to garnishee orders and attachment of debts is founded on and is the same as the old practice, and the principles of those cases apply.

FN2 Law Rep. 7 Ex. 332.

FN3 18 C. B. 757.

FN4 Law Rep. 3 C. P. 235.

FN5 4 K. & J. 633.

FN6 Law Rep. 3 C. P. 264.

*Charles Browne* in reply.

*Bramwell Davis,* for the official liquidator.

CHITTY, J.:—

I prefer to decide this case on broad principles: putting aside all question whether *Whitehouse* did or did not have notice of the prior charges and leaving out of consideration the actual effect of a garnishee order *nisi* which has been served but not made absolute, I give my judgment on the substance of the case, which is this: the liquidator of this company had in his hands a sum of money which had been allowed to *Wills* in the winding-up of the company. [His Lordship shortly stated the facts down to the obtaining and service of the garnishee order *nisi*, and continued:—] This order *nisi* was obtained under Rules of Supreme Court, Order XLV., r. 1, which re-embodies the practice *515 established by the Common Law Procedure Act, 1854, as to garnishee orders and the attachment of debts; the effect of this order nisi was to give the judgment creditor execution against the debts owing to his debtor. The Common Law Procedure Act, 1854, is, so far as attachment of debts is concerned, in *pari materiâ;* with 1 & 2 Vice. c. 110, and as to a charging order under these matter Acts it has now been settled that it charges only what the judgment debtor can himself honestly deal with; that rule is now settled. Order XLV. is in *pari materiâ;* with both the Acts I have mentioned. It is argued by Mr. *Browne* that I ought not to apply the well-settled rule to this case. But I see no reason why any Act of Parliament or Rules of Court should be so interpreted as to make a man do a dishonest act, and yet if I were to allow Mr. *Browne's* argument the judgment creditor would obtain, not the property of the judgment debtor, but that of some one else. The Court cannot arrive at such a conclusion unless the Act of Parliament compels it to do so. It was considered at one time that the Court could, under the wording of 1 & 2 Vice. c. 110, arrive at the conclusion contended for by Mr. *Browne,* and in Watts v. Porter [FN7] one of the Common Law Courts actually did arrive at that curious conclusion, but on the question being reconsidered in subsequent cases the law was set right. The principle, which is well stated in Hirsch v. Coates [FN8] as long ago as 1856, applies in full force to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*(1886) L.R. 32 Ch.D. 512*
*1886 WL 14223 (Ch D), (1886) LR 32 Ch. D. 512*
**(Cite as: (1886) LR 32 Ch. D. 512)**

Order XLV., and it is upon this principle I propose now to act. The assignment and charge from *Wills* to *Hillier* and *Segar* is binding and good as between assignor and assignee, and the equitable doctrine of notice one comes in as between incumbrancers. As between two incumbrancers the Court looks at the equitable position of the two claimants, and holds that as between them the first assignee, by omitting to give notice of his charge has enabled the assignor to deal with the fund as if he were still the owner, and thus to commit a fraud upon the subsequent assignee, and consequently must be postponed: the first assignee had been negligent, the second diligent, and therefore the second assignee was allowed for his diligence by being first to give notice, to rank first.

FN7 3 E. & B. 743.

FN8 18 C. B. 757.

*516 I apply these principles broadly as against the judgment creditor who has obtained the garnishee order here, and say that he can only obtain what the judgment debtor could honestly give him.

The result, therefore, is that Mr. *Whitehouse* must be postponed.

**Representation**

Solicitors for Withall & Co.: Withall & Co.

Solicitors for Whitehouse: Batty & Whitehouse.

Solicitors for Hillier and Segar: Underwood & Co.

Solicitor for the official liquidator: Arthur Toovey.

(F. G. A. W.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1942] 2 K.B. 1
1942 WL 30802 (KBD), [1942] 2 K.B. 1
(Cite as: [1942] 2 K.B. 1)

*1 Holt v. Heatherfield Trust, Limited, and Another.

King's Bench Division

KBD

Atkinson J.

1942 Jan. 21, 22, 28.

Garnishee order--Sum garnisheed subject--matter of equitable assignment--Priority--Effective date of notice of assignment--Law of Property Act, 1925 (15 Geo. 5, c. 20), s. 136 .

P. having recovered judgment for a sum of money against the C. company assigned the judgment debt absolutely to the plaintiff in part payment of a debt then due from him to the plaintiff. After the assignment, but before notice thereof had been received by the C. company, the defendants obtained a garnishee order nisi charging the judgment debt:-

Held, that the assignment, even on the assumption that it was made without consideration, was a good equitable assignment, and as the garnishee order only charged property with which the assignor could honestly deal it did not charge the assigned debt which was the property of the assignee.

The date of the notice to the debtor under s. 136 of the Law of Property Act, 1925 , of the assignment of his debt, is the date of the reception of the notice by the debtor.

*2 ISSUE in an action.

The plaintiff, Richard Henry Holt, claimed against the defendants, Heatherfield Trust, Ld., and G. & T. Bridgewater, Ld., a sum of money recovered by Samuel Whitmore Partington, their debtor, under a judgment against the Chloride Electrical Storage Co., Ld. The judgment was obtained by Partington on June 14, 1940, and on

that day Partington assigned the sum due thereunder to Holt, which assignment Holt received on June 15. On June 15, Heatherfield Trust, Ld., obtained a garnishee order nisi on the same sum, which was served on the Chloride company on June 17. On June 17, the plaintiff sent notice of the assignment to the Chloride company, which was received by the latter on June 18. Heatherfield Trust, Ld. claimed that the assignment to Holt was void and a fraud on them and on other creditors under s. 172 of the Law of Property Act, 1925 . Alternatively, they claimed that on June 17, when the garnishee order became effective, the plaintiff's title was incomplete as being an equitable assignment only until notice was given to the Chloride company on June 18, and also, that the assignment, being made without consideration, was of no avail as against the garnishee order. Atkinson J. found that Holt was a bona fide creditor of Partington for money lent. He also found that Partington intended to prefer Holt to the defendants, but held, following Glegg v. Bromley [FN1] , that the assignment was not fraudulent within 13 Eliz. c. 5 (since repealed by s. 207 and sch. VII. to the Act of 1925 and substantially re-enacted by s. 172 of the later Act).

FN1 [1912] 3 K. B. 474 .

Morle for the plaintiff.

Geoffrey Lawrence for the defendants.

The contentions of the parties sufficiently appear in the judgment.

Cur. adv. vult.

1942. Jan. 28. ATKINSON J.

, having stated the facts, and dealt with the contention that the assignment to the plaintiff was fraudulent, continued: The next point is more difficult. It is said that the assignment was ineffective inasmuch as notice of it had not been given before the service of the garnishee order, so that at the date of the service of the garnishee order it was merely an equitable *3 assignment and de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 3

[1942] 2 K.B. 1
1942 WL 30802 (KBD), [1942] 2 K.B. 1
(Cite as: [1942] 2 K.B. 1)

he may sue in his own name provided that he makes the assignor a party to the action, as plaintiff if he consents, and as defendant if he does not consent. This is made quite clear in Performing Right Society, Ld. v. London Theatre of Varieties, Ld. [FN8] , where Viscount Cave L.C. said [FN9] : "No action can now be defeated by reason of the misjoinder or non-joinder of any party; but this does not mean that judgment can be obtained in the absence of a necessary party to the action, and the rule is satisfied by allowing parties to be added at any stage of a case." That case turned on whether an assignment of rights in a proposed musical composition passed a good title to the Performing Right Society as and when the composition came into existence. It was held that there was no right of action for an infringement of copyright unless the composer was joined as plaintiff or defendant. Viscount Finlay put it thus [FN10] : "The society *5 became entitled to sue in respect of the interests so acquired, but their right to sue is subject to the general rule that the owner of the legal estate should be joined as a party." Lord Sumner pointed out [FN11] that the matter had been raised and the plaintiffs had been given an opportunity of joining the legal owner; that deliberately the plaintiffs had not taken advantage of that opportunity; that the courts were dealing with the matter in the absence of the legal owner and they could not give the relief prayed. It is elementary, I think, in such a case, because even in a students' book (Snell's Equity, 22nd ed., p. 56) it is laid down quite clearly: "But, if the assignment of a legal thing in action is only equitable, the original creditor must usually be joined, as plaintiff if he consents, if not, as defendant."

FN8 [1924] A. C. 1 .

FN9 Ibid. 14.

FN10 Ibid. 18.

FN11 [1924] A. C. 25 .

Therefore, it seems beyond argument that the absence of notice does not affect the efficacy of the transaction as between assignor and assignee. The Supreme Court of Judicature Act, 1873 ,

relieved the assignee from the necessity of applying to equity for help, and therefore, valuable consideration is no longer necessary. Neither the Act of 1873 nor the Act of 1925 says a word about consideration. It is not suggested that valuable consideration is necessary if there is an absolute assignment and notice is given, but it is contended that, although valuable consideration may be unnecessary if notice be given, it is necessary to give validity to the transaction if notice be not given or until notice be given. If A. holds by way of gift an absolute assignment of an existing debt of which notice has not yet been given, it is said to be unenforceable and invalid. Yet, once A. gives notice, the invalidity is destroyed and the invalid becomes valid. It would, indeed, be strange if mere notice of an invalidity could destroy that invalidity, and, so far from being invalid, the assignment entitles the assignee to sue for the debt assigned even before notice is given so long as he joins the assignor on one side or another.

An assignment can operate as an assignment only with regard to an existing legal chose in action. An assignment purporting to assign a future debt can operate only as a contract to assign. It remains a purely equitable assignment which will be enforced like any other contract only if given for value. The assignment with which I am concerned is absolute in form and purports to assign an existing legal debt.

Counsel for the plaintiff contended that, as by s. 136 of the Law of Property Act, 1925 *6 , the notice is to operate from the date of the notice, and as the date of the notice was June 17, 1940, the notice must be effectual as from that date and not from the date of its receipt by the debtor on June 18. That point, in my opinion, is bad. Sect. 136 reads as follows: " [FN12] . Any absolute assignment by writing under the hand of the assignor (not purporting to be by way of charge only) of any debt or other legal thing in action, of which express notice in writing has been given to the debtor, trustee or other person from whom the assignor would have been entitled to claim such debt or thing in action, is effectual in law (subject to equities having priority over the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1942] 2 K.B. 1
1942 WL 30802 (KBD), [1942] 2 K.B. 1
(Cite as: [1942] 2 K.B. 1)

right of the assignee) to pass and transfer from the date of such notice - (a) the legal right to such debt or thing in action." The date of "such notice" is the date of a notice which has been given to the debtor, and refers back to the express notice in writing mentioned earlier in the section. It is express notice in writing given to the debtor, and, in my judgment, the date of that notice is the date on which it is received by or on behalf of the debtor. If it arrives at his place of business and he happens to be away and does not see it personally for a day or two, that would be immaterial. It would be received on his behalf. The date cannot be the date of the notice, because a notice might be written and dated a week before it was posted and it would be absurd to suppose that that would be effective.

FN12 [1909] 1 Ch. 291 .

The further proposition which has been established is that a judgment creditor stands only in the shoes of his debtor and can take only that which the debtor can honestly deal with at the time the order nisi is served. Thus, he is not in such a good position as an assignee, who may defeat an earlier assignee by getting his notice in first. Notice is required only for the protection of the debtor or subsequent assignees. If the creditor were in as good a position as the subsequent assignee, it might be that the defendants would come in first, but the cases show that a creditor who has obtained a garnishee order is not in as good a position as a subsequent assignee.

The defendants relied on two cases. The first was Wigan v. English & Scottish Law Life Assurance Association [FN13] . It is quite plain that the question of valuable consideration was being considered only because the saving clause in the life policy which had been assigned required that the bona fide interests of the third parties must be based on valuable *7 consideration. The question arose in this way. One H. was entitled to a policy of assurance for 500l. on his own life subject to conditions which made the policy void if the life assured died by his own hand, but without prejudice to the bona fide interests of third parties based on

valuable consideration. H. owed Wigan 15,000l., and he executed a deed of assignment of the policy to Wigan by way of mortgage to secure the moneys owing. There was, therefore, no consideration for the assignment. No notice of the existence of the assignment was given to the insurance company during H.'s lifetime, and he died by his own hand. A claim was made, and the court held that, as there was no valuable consideration for the assignment within the saving clause in the policy, the action failed. What was said in the argument and the judgment as to the necessity for valuable consideration was not directed to the question whether there could be a good assignment without consideration, but whether there was valuable consideration as required by the terms of the policy itself. The case throws no light at all on the question I have to consider.

FN13 [1909] 1 Ch. 291 .

The other case relied on was Glegg v. Bromley [FN14] . In May, 1909, Mrs. Glegg started an action against one Hay claiming damages for false representation, and in October of the same year she began an action against a Lady Bromley for slander. At that time Mrs. Glegg was indebted to her husband, Captain Glegg, to the extent of about 7000l. on the security of mortgages of her property, and she owed large sums to other creditors. In May, 1910, before the action against Hay had been heard, she assigned to the husband all the moneys she might get in the action against Lady Bromley. In June, Hay obtained judgment against her for 218l. for his costs in the action against him, and in July Mrs. Glegg obtained judgment for 200l. against Lady Bromley. Hay thereupon obtained a garnishee order to attach those damages in respect of the debt due to him for costs, and his claim was met by the assignment to Captain Glegg. The issue was first tried by a master, and he upheld the assignment to Glegg on the ground that, as Mrs. Glegg owed money to her husband, the assignment was for value and the intention to prefer did not prevent it from being bona fide under 13 Eliz. c. 5 . The Divisional Court reversed that decision on the ground that the assignment was a fraudulent assignment under 13 Eliz. c. 5 ,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1942] 2 K.B. 1
1942 WL 30802 (KBD), [1942] 2 K.B. 1
(Cite as: [1942] 2 K.B. 1)

the donor on the back, and the learned judge held that that was a good equitable assignment of the amount on deposit at the bank. It is quite true that in that case there was a second ground on which the learned judge said that the donee was also entitled to succeed - namely, that he had been appointed executor of the donor, and that therefore the transaction fell within the decision of Strong v. Bird [FN29] . It is quite clear however from his judgment that the learned judge would have reached the same conclusion apart from that second ground, and the first reason which he gave for his decision is in my opinion completely applicable to the present case. The third case which is in some respects similar to the present is In re Williams [FN30] , where it was held that the alleged assignment was bad as being conditional and future. It is to be noticed however that the assignment in that case was an assignment without consideration, and if the question of consideration was essential there was a very simple means of arriving at the conclusion at which the Court of Appeal arrived without the necessity of going through the difficult questions arising in that case as to the real meaning of the documents. It appears to me that the Court of Appeal really assumed in that case - without, I agree, actually deciding the point - that the voluntary character of the assignment was not fatal to its efficacy."

FN25 [1919] 2 Ch. 104 .

FN26 [1919] 2 Ch. 111 .

FN27 (1886) 17 Q. B. D. 442 .

FN28 [1899] 1 Ch. 408 .

FN29 (1874) L. R. 18 Eq. 315 .

FN30 [1917] 1 Ch. 1 .

I would like to refer to one passage of the judgment of Warrington L.J. in In re Williams [FN31] . In that case, as Sargant J. said, the question was whether there was an assignment. The words of the document relied on were these: "I authorise .... my housekeeper, and no other person to draw this insurance in the event of my pre-

deceasing her this being my sole desire and intention at time of taking this policy out and this is my signature." It was decided that that did not constitute *14 an assignment. It was regarded as a somewhat difficult point. As Sargant J. said, however, in In re Westerton [FN32] there was a very simple answer if valuable consideration was necessary to support an equitable assignment. The Court of Appeal assumed that, if the document had in form been an assignment, it would have been good. Warrington L.J. said [FN33] : "Claiming as she does as a volunteer and alleging that the assignor made this gift to her, she can only succeed if she can show that the assignor did everything which according to the nature of the property comprised in the assignment was necessary to be done in order to transfer the property and render the assignment binding upon him."

FN31 [1917] 1 Ch. 1 .

FN32 [1919] 2 Ch. 112-113 .

FN33 [1917] 1 Ch. 8 .

Bearing in mind these two results, first, that the assignment was a perfectly good equitable assignment, which could be turned into a legal assignment at any moment by giving notice, and which without notice, the assignee could have sued upon so long as he joined the assignor as defendant, and, secondly, that a judgment creditor is in no better position than the assignor and cannot garnishee anything which the assignor could not honestly deal with, it seems to me perfectly clear that the plaintiff's title is a good one, and I so decide. I hold that his claim to the money is good.

**Representation**

Solicitors for plaintiff:Warmingtons . Solicitors for defendants:Thompson & Co .

Judgment for plaintiff. (W. L. L. B. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



# Commercial Injunctions

(formerly Mareva Injunctions and Anton Piller Relief)

*Fifth Edition*

Steven Gee Q.C., M.A. (Oxon.)
*of the Middle Temple,*
*and of the New York Bar,*
*sometime of Brasenose College,*
*Oxford University, and standing junior*
*counsel to the Department of*
*Trade and Industry (ECGD)*

*Foreword to the Fifth Edition by*
The Right Honourable Lord Hoffmann

*Appendix A on New York Law and Federal Practice by*
Jonathan Greenblatt,
*Litigation Partner with*
*Shearman & Sterling, and*
A.Benjamin Spencer,
*a former Litigation Associate with Shearman &*
*Sterling and currently Assistant Professor of Law at the Univer-*
*sity of Richmond School of Law.*

LONDON
Sweet & Maxwell
2004

third parties' rights in assets which have to be resolved. Proceedings under Article 22(5) can be served without permission under CPR r.6.19. In cases not governed by CPR r.6.19, the non-party can be served with proceedings in relation to the enforcement of a judgment or arbitral award under CPR r.6.20(9).

In cases in which the judgment is to be enforced by a foreign court an injunction can be granted by the English court in support of the enforcement proceedings abroad pursuant to s.25 of the Civil Jurisdiction and Judgments Act 1925.

### Category (3)

An application for interim relief under s.25(1) of the Civil Jurisdiction and 13.033 Judgments Act 1982 can be served out of the jurisdiction with permission granted under CPR 6.20(4). That rule is wide enough to allow permission to be granted to enable interim relief proceedings on a defendant to the foreign proceedings on the merits and upon a person who is not a party to the substantive proceedings but who is to be made subject to an order made by way of interim relief.[28] As a matter of discretion it may be "inexpedient" to grant interim relief in such circumstances.[29]

## (6) Cases in which the non-party does not claim to own the assets outright

It may be that the non-party does not claim that he owns the assets 13.034 outright, only that he has an existing right to possess or to sell them: *e.g.* because he has a charge or lien over them. Mortgagees and debenture-holders are among the most common types of third party affected by Mareva injunctions falling within this category; frequently they are also banks. A Mareva injunction will not normally be allowed to interfere with the exercise by a mortgagee of his powers of sale.[30] Similarly, if the assets are clearly subject to a pre-existing lien or other charge, the court will usually exclude them from the terms of the Mareva injunction, or the third party will be granted a specific variation enabling him to exercise his rights in respect of those assets.[31]

An equitable charge or assignment can be created by contract, and will be effective to create priority even though, in the case of a debt, it has not

---

[28] See Chapter 6, paras 6.073–77, above.
[29] See Chapter 6, paras 6.050–59, above.
[30] For an example of a case where an injunction specifically aimed at preventing the sale of two mortgaged vessels was discharged, see *The Arietta and Julia* [1985] 2 Lloyd's Rep. 50.
[31] *Capital Cameras Ltd v Harold Lines Ltd* [1991] 1 W.L.R. 54; *Cretanor Maritime Co. Ltd v Irish Marine Management Ltd* [1978] 1 W.L.R. 966; *Pharoah's Plywood Co. Ltd v Allied Wood Products*, Court of Appeal (Civ Div) Transcript No. 217 of 1980 (January 18, 1980). See also Chapter 4, para.4.015.

392   *Mareva relief against assets*

yet been notified to the debtor.[32] If there is a bona fide commercial agreement which regulates how particular assets are to be dealt with, then ordinarily Mareva relief will be varied to enable that agreement to be performed. In *SSAB Oxelosund AB v Xendrai Trading Pte Ltd*,[33] there was a binding commercial agreement regulating the distribution of proceeds of a hull insurance policy, and the court declined to grant an injunction interfering with performance of this agreement. The Mareva injunction should not interfere with carrying out bona fide transactions agreed at arm's length with a third party in the ordinary course of business.

---

[32] *Pharoah's Plywood Co. Ltd v Allied Wood Products*, Court of Appeal (Civ Div) Transcript No.217 of 1980 (January 18, 1980); *Holt v Heatherfield Trust Ltd* [1942] 2 K.B. 1 at 14.
[33] [1992] 1 S.L.R. 600 (Singapore).